(Ernest CONSIDINE), Wilbur J. Meyer Jr., John L. Mittelstedter, Robert Porter, Bernice McBride, M. Lee Bex, Plaintiffs–Appellants,

v.

NEWSPAPER AGENCY CORPORATION; Salt Lake Typographical Union No. 115; Communications Workers of America, Defendants–Appellees.

No. 92–4170.

United States Court of Appeals, Tenth Circuit.

Dec. 28, 1994.

Elizabeth T. Dunning of Watkiss Dunning & Watkiss, Salt Lake City, UT, (Mary J. Woodhead of Watkiss Dunning & Watkiss and H. Dickson Burton of Woodbury & Kesler, with her on the brief) for plaintiffs-appellants.

James S. Lowrie of Jones, Waldo, Holbrook & McDonough, Salt Lake City, UT, (Deno G. Himonas of Waldo, Holbrook & McDonough and Sharon E. Sonnenreich, Salt Lake City, UT, with him on the brief) for defendant-appellee Newspaper Agency Corp.

James B. Coppess, Washington, DC (Arthur F. Sandacks, Salt Lake City, UT, and Gerard C. Boyle, Washington, DC, with him on the brief) for defendants-appellees Salt Lake Typographical Union No. 115 and Communications Workers of America.

Before BALDOCK, McKAY, and EBEL, Circuit Judges.

EBEL, Circuit Judge.

A group of former and present employees ("Plaintiffs") of the Newspaper Agency Corporation ("NAC") allege that the Salt Lake Typographical Union No. 115 ("Local 115") and the Communications Workers of America ("CWA") breached a duty of fair representation under § 301 of the Labor Management Relations Act ("LMRA"), codified at 29 U.S.C. § 185. Four of the Plaintiffs further allege that NAC violated the Age Discrimination in Employment Act ("ADEA"), codified as amended at 29 U.S.C. § 626. The district court granted the unions' summary judgment motion on the § 301 claim. The age discrimination claim was tried before a jury, which ruled in favor of NAC. The court denied the Plaintiffs' Fed.R.Civ.P. 50 motion for judgment as a matter of law and Fed.R.Civ.P. 59 motion for a new trial on their age discrimination claim. Before us is the Plaintiffs' appeal on both the summary judgment dismissal of their § 301 claim and the denial of the Rule 50 and Rule 59 motions. We affirm.

## I. BACKGROUND

This combined action against NAC and two labor organizations arose from NAC's automation of its newspaper production process in 1986, which rendered the Plaintiffs' positions obsolete. NAC, a Utah corporation, is the advertising, printing, and circulation agent for the *Salt Lake Tribune* and the *Deseret News*, Salt Lake City's two daily newspapers. The Plaintiffs performed production and advertising tasks in NAC's "composing rooms" and belonged to Local 115, the exclusive bargaining agent for NAC's composing room employees since 1952.[1] CWA is Local 115's international affiliate.

---

1. Under the terms of Local 115's collective bargaining agreement with NAC, composing room

In 1986, NAC purchased a computerized system to enhance the efficiency and quality of its advertisement production—the Triple I system. Rather than installing this new system in the composing rooms in which the Plaintiffs had worked, NAC opted instead to create a new site for Triple I named the "Oak Room." This decision promptly triggered a dispute between Local 115 and NAC over whether the work performed on Triple I fell within Local 115's jurisdiction—i.e. whether the Oak Room was a composing room. At stake was Local 115's authority, under the existing collective bargaining agreement, to require NAC to abide by the agreement's hiring procedures and thus give first priority to composing room employees in filling Oak Room positions.

Pursuant to § 3.1 of the existing collective bargaining agreement, Local 115 exercised jurisdiction over:

> all employees of [NAC's] composing rooms (the environmental rooms, the ad composition rooms, the markup rooms, the proofrooms, the page markup rooms, the keyboarding rooms and the dark rooms) employed in the actual day-to-day production of the newspapers produced by [NAC], who shall be journeymen and apprentices who perform operations such as, but not limited to, markup (both ad and news), composition, keyboarding, pasteup, machine monitoring, tape processing for and operations of computer input and output devices, operations of CRTs (VDT), OCRs, proofing devices and operation of phototypesetters, operations of cameras, processing of photocomposition film, tape perforation, proofreading, operation of page mark-up devices, mechanical color break

and maintenance of equipment in [NAC's] composing rooms. (emphasis added).

Pointing to this clause, Local 115 argued that its jurisdiction extended to the Oak Room because Triple I was dedicated to the same type of production operations as had previously been undertaken in composing rooms. In rebuttal, NAC maintained that the collective bargaining agreement was expressly limited to the composing rooms, as evidenced by § 1 of the Supplemental Agreement: "the Union recognizes ... that [NAC] may use similar equipment ... in other departments of [NAC]." NAC argued that the Oak Room was simply another department.

Consistent with its interpretation of the collective bargaining agreement, NAC installed Triple I in August 1986 and hired eighteen employees without following the collective bargaining agreement's priority-hiring procedures.[2] Local 115 knew that Triple I would reduce the need for composing room employees and was skeptical about the potential to negotiate a compromise with NAC. Accordingly, on November 5, 1986, Local 115 filed a formal grievance with NAC to apply the collective bargaining agreement to the Oak Room.[3]

Meanwhile, the collective bargaining agreement expired on December 31, 1986, and the parties agreed only to keep that agreement in effect on a day-to-day basis, pending negotiation of a new agreement. When the Triple I grievance process appeared futile, Local 115 proposed arbitration. NAC, however, refused arbitration and instead filed a unit clarification petition with the National Labor Relations Board ("NLRB") on April 16, 1987. Concurrently, Local 115 filed its own petition with the

employees were divided into two categories: job guarantee and non-job guarantee holders.

Job guarantee holders are those bargaining unit members hired prior to January 1, 1974. Among their job security rights is the right, in the event of a reduction-in-force, to transfer to a different job within NAC at or above their current salary or to obtain severance benefits. Individuals hired between January 1, 1974 and December 31, 1977 obtained job guarantees as individuals hired before January 1, 1974 retired or left NAC.

In contrast, non-job guarantee holders were hired after December 31, 1977 and do not enjoy

these job security benefits. The Plaintiffs are non-job guarantee holders.

2. Of the eighteen hired for Triple I positions, eight were former composing room employees (and thus Local 115 members) and ten were nonunion members who had worked in other departments.

3. Local 115 concurred with NAC's estimate that the Triple I would reduce the composing rooms workforce from 100 to 20.

NLRB that accused NAC of engaging in unfair labor practices.

As both sides dug in their heels and prepared for protracted litigation, counsel for Local 115 and NAC rekindled settlement talks. On July 17, 1987, NAC officer Jay Carlson met with Ken Prarie, a CWA representative who had been assigned to assist Local 115 for the past 25 years.[4] The parties convened a second meeting on August 4th that included Richard Rosenblatt (Local 115's counsel) and Glenn Webb (NAC's Production Manager). With settlement prospects improving, the President and Vice President of Local 115, Larry McNeil and Horst Reschke, respectively, participated in a third meeting on August 20th. At this point, the two sides identified their negotiating teams: the Local 115 representatives included President McNeil, Vice President Reschke, Prarie, and Rosenblatt, and NAC was represented by Webb, Carlson, and their counsel, James Lowrie and James Stewart.

What emerged from these negotiations on September 9, 1987 was a tentative settlement agreement in which NAC consented to the inclusion of the Triple I positions in Local 115's bargaining unit in exchange for an agreement that the remaining composing room employees could not displace those non-composing room employees that NAC had already assigned to Triple I positions. While the parties continued to refine the draft settlement agreement, NAC announced that the 22 least senior employees in the composing rooms—including the Plaintiffs—would be terminated on December 12, 1987.[5] In late December 1987 and early 1988, twenty of these employees filed age discrimination charges with the Utah Anti–Discrimination Division and the Equal Employment Opportunity Commission.

Local 115 representatives intended to obtain relief for the discharged employees in a new collective bargaining agreement, but NAC refused to conclude a new agreement until the parties resolved the Oak Room dispute. However, Local 115 and NAC officials failed to craft a mutually-acceptable Oak Room settlement agreement. With negotiations stalled in December 1987, Local 115 President McNeil submitted NAC's most recent settlement proposal to the Local 115 members for a vote. The members rejected the proposal.

After renewed negotiations, the parties ultimately reached a settlement agreement in February 1988 under the following terms: (1) Local 115's bargaining unit would include the Triple I positions in the Oak Room; (2) NAC would retain the twelve non-composing room employees trained on and assigned to the Triple I, with their compensation subject to negotiation in the new collective bargaining agreement; (3) NAC would increase the salary for the eight former composing room employees hired for the Triple I commensurate with the wage they received in the composing room; and (4) all new employees included in the bargaining unit would enjoy the right to transfer to non-unit positions to avoid being laid off.

On March 27, 1988, Local 115 representatives presented the settlement agreement to the membership for ratification. Both Rosenblatt and Prarie answered questions about the agreement and President McNeil and Vice President Reschke endorsed it. Local 115 representatives informed the members that any outstanding grievances would have to be listed on Attachment A to the settlement agreement and brought to the attention of union officials. All members were invited to specify any outstanding grievances that they would like included in Attachment A. The sole grievance identified was one that Local 115 Chapel Chairman David Bennett had originally filed on January 19, 1988, alleging that NAC violated the training clause provisions of the collective

---

4. The CWA is Local 115's current international affiliate. Originally, the international affiliate was the International Typographical Union ("ITU"), but the ITU merged with the CWA in January 1987. Prior to the merger, Mr. Prarie assisted Local 115 in his capacity as an ITU representative and post-merger he served as a CWA representative.

5. The employees slated for layoff were the only ones in the composing room who did not have job guarantees.

bargaining agreement.[6] President McNeil assured the members that this grievance would be included in Attachment A, and the grievance was ultimately settled on April 5, 1988.

At this meeting, the members ratified the settlement agreement by a vote of 30 to 19. NAC and Local 115 officials signed it on April 5, 1988.

On June 13, 1988, the Plaintiffs commenced this action in the United States District Court for the District of Utah, alleging that (1) NAC terminated them from the composing rooms on the basis of age, in violation of the ADEA; and (2) Local 115 and CWA breached a duty of fair representation under § 301 of the LMRA.[7] On August 15, 1991, the district court granted summary judgment in favor of Local 115 and CWA on the § 301 claim. On October 29, 1991, the court entered a pretrial order on the age discrimination claim, permitting the Plaintiffs to amend their complaint so as to allege discrimination in the failure to hire them in the Oak Room. In response, NAC argued that the Plaintiffs failed to file a timely charge because NAC's failure to hire occurred in excess of 300 days from when the Plaintiffs filed a complaint with the Utah Anti–Discrimination Division.

The court reserved judgment on NAC's timeliness defense and the age discrimination claim was tried before a jury. When the jury returned its verdict in favor of NAC, the court declared the timeliness question moot. Pursuant to Fed.R.Civ.P. 50, the Plaintiffs next filed a motion for judgment as a matter of law. The Plaintiffs also filed a Fed.R.Civ.P. 59 motion for a new trial, arguing that the jury's verdict was against the weight of the evidence and that the court erroneously instructed the jury. The court denied both motions.

We address in turn the Plaintiffs' appeal from the court's summary judgment ruling on the § 301 claim and its denial of the Rule 50 and 59 motions on the ADEA claim.

## II. DISCUSSION

### A. Duty of Fair Representation

#### 1. Standard of Review

■ We review de novo the grant of summary judgment and apply the same standard used by the district court. *Applied Genetics Int'l. Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990). Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as matter of law." Fed.R.Civ.P. 56(c). We examine the factual record and reasonable inferences therefrom in the light most favorable to the Plaintiffs, who opposed summary judgment. *Applied Genetics,* 912 F.2d at 1241.

■ Local 115 and CWA, as the moving parties, have the initial burden to show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Once the moving parties meet this burden, the burden shifts to the Plaintiffs to identify specific facts that show the existence of a genuine issue of material fact. *Bacchus Indus., Inc. v. Arvin Industries, Inc.,* 939 F.2d 887, 891 (10th Cir.1991). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," summary judgment in favor of the moving party is proper. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

---

**6.** Section 28.4 of the collective bargaining agreement states NAC's training obligation:

Prior to implementation of a board cut, the foreman will determine which, if any, priority situation holders have not received all-around training *and will face a board cut if such training is not given,* and the foreman will thereupon offer such training to said employees. (emphasis added).

**7.** Originally, the plaintiff class consisted of the twenty discharged employees who filed the age discrimination claim with the Utah Anti–Discrimination Division. However, NAC settled with numerous plaintiffs prior to trial and only Plaintiffs Meyer, Mittelstedter, McBride, and Bex bring this appeal.

### 2. Section 301 of LMRA

■ A suit against a labor union under § 301 of the LMRA involves two claims: "(1) that the employer breached the collective bargaining agreement, and (2) that the union breached its duty of fair representation." *Aguinaga v. United Food & Commercial Workers Int'l*, 993 F.2d 1463, 1469 n. 1 (10th Cir.1993) (citing *DelCostello v. International Bhd. of Teamsters*, 462 U.S. 151, 163–65, 103 S.Ct. 2281, 2289–91, 76 L.Ed.2d 476 (1983)), *cert. denied,* —— U.S. ——, 114 S.Ct. 880, 127 L.Ed.2d 75 (1994). Although only the unions are named defendants, the Plaintiffs must prove both breaches because these "two claims are inextricably interdependent." *DelCostello,* 462 U.S. at 164–65, 103 S.Ct. at 2291.[8]

■ A union breaches its duty of fair representation to its members only if its actions during negotiations with an employer are "arbitrary, discriminatory, or in bad faith." *Air Line Pilots Ass'n, Int'l v. O'Neill,* 499 U.S. 65, 67, 111 S.Ct. 1127, 1130, 113 L.Ed.2d 51 (1991) (*"ALPA"*). As we have explained,

> [a] union's actions are *arbitrary* only if, "in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational." *Id.* [499 U.S. at 67, 111 S.Ct.] at 1130. A union's *discriminatory* conduct violates its duty of fair representation if it is "invidious." *Id.* [499 U.S. at 80–82, 111 S.Ct.] at 1137. *Bad faith* requires a showing of fraud, or deceitful or dishonest action. *Mock v. T.G. & Y. Stores Co.,* 971 F.2d 522, 531 (10th Cir.1992).

*Aguinaga,* 993 F.2d at 1470 (emphasis added).

■ This duty of fair representation is anchored on the principle that a union's "exercise of a granted power to act in behalf of others involves the assumption toward them of a duty to exercise the power in their interest and behalf." *Steele v. Louisville & Nashville R. Co.,* 323 U.S. 192, 202, 65 S.Ct. 226, 232, 89 L.Ed. 173 (1944) (applying the Railway Labor Act). The Supreme Court has explained that "a union owes employees a duty to represent them adequately as well as honestly and in good faith." *ALPA,* 499 U.S. at 75, 111 S.Ct. at 1134.

■ At the same time, the highly deferential standard of judicial review articulated in *ALPA* recognizes the "wide latitude that negotiators need for the effective performance of their bargaining responsibilities." *Id.* 499 U.S. at 78, 111 S.Ct. at 1135. Rank and file members of a labor union invariably have conflicting interests and thus form multiple, and at times competing, constituencies. Concessions and compromises are inevitable by-products of the bargaining process and any single bargaining decision may inure to the benefit of some members while potentially injuring others. Thus, union negotiators often find their members divided over the relative merits of the components of a settlement agreement. Our task, however, is not to divine what would have been the most ideal bargain for the collective body or a subset of the union, but rather to examine whether the union's overall performance satisfied the *ALPA* standard.

Guided by these principles, we examine the following specific allegations which comprise the Plaintiffs' contention that Local 115 and CWA representatives engaged in arbitrary, discriminatory, and bad faith conduct: (1) CWA representatives Rosenblatt and Prarie met with NAC management to discuss possible means to settle the grievance, without

**8.** Because we agree with the district court that the Plaintiffs have failed to establish that Local 115 and CWA breached their duty of fair representation, we focus only on this element of the § 301 claim and need not reach whether NAC breached the collective bargaining agreement. Also, we assume, without deciding, that CWA had a duty of fair representation to the members of Local 115 as Local 115's international affiliate. *Carbon Fuel Co. v. United Mine Workers,* 444 U.S. 212, 217–18, 100 S.Ct. 410, 414–15, 62 L.Ed.2d 394 (1979) (explaining that common law agency principles govern the liability of an international affiliate for the actions of a local chapter); *Moore v. Local Union 569 of the IBEW,* 989 F.2d 1534, 1543 (9th Cir.1993) (an international affiliate acts as an agent for the local chapter when the international "instigated, supported, ratified or encouraged" the local's activities), *cert. denied,* —— U.S. ——, 114 S.Ct. 1066, 127 L.Ed.2d 385 (1994).

first notifying the members of Local 115; (2) Local 115 and CWA negotiators "decided not to negotiate on plaintiffs' behalf"; (3) CWA attorney Rosenblatt did not know how many Local 115 members held job guarantees; (4) CWA representative Prarie testified that the unions' primary objective during negotiations was to gain jurisdiction over the Oak Room; (5) the unions "affirmatively negotiated away plaintiffs' existing contractual rights to training without notice to or ratification by the Local membership"; (6) the agreement regarding training rights was not made a part of the settlement agreement until after the membership ratified the settlement agreement; (7) the Plaintiffs were led to believe that their grievances would be preserved, but the grievances were not preserved; (8) the agreement placed the Plaintiffs at increased risk of layoff; and (9) the unions negotiated benefits for every member of the union except the Plaintiffs.

### (a) Irrational Standard

█ In light of the history of the dispute between the unions and NAC, and the genuine possibility of protracted and uncertain litigation that the negotiators faced when they crafted the final settlement, we conclude that Local 115 and CWA's alleged conduct is not " 'so far outside a wide range of reasonableness' as to be irrational." *ALPA,* 499 U.S. at 67, 111 S.Ct. at 1130 (quoting *Ford Motor Co. v. Huffman,* 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953)).

In *ALPA,* the Court explained that a "settlement is not irrational simply because it turns out in retrospect to have been a bad settlement." *Id.* 499 U.S. at 79, 111 S.Ct. at 1136. In that case, a group of airline pilots engaged in a choleric strike when Continental Airlines repudiated its collective-bargaining agreement with the pilots' union and reduced the pilots' salaries and benefits. The pilots alleged that the union violated its

duty of fair representation by settling the dispute with Continental Airlines on potentially worse terms than if the pilots themselves had unilaterally abandoned the strike.[9] Whereas the striking pilots desired reinstatement strictly according to seniority, the settlement agreement permitted Continental to allocate numerous Captain positions to nonstriking pilots, irrespective of the nonstriking pilots' seniority. The Court rejected the pilots' claim against the union because, at the time settlement was made, Continental appeared resolute about ignoring the striking pilots' seniority and giving first priority to all nonstriking pilots. *Id.* 499 U.S. at 78–82, 111 S.Ct. at 1136–37.

> At the very least, the settlement produced certain and prompt access to a share of the new jobs and avoided the costs and risks associated with major litigation.... In labor disputes, as in other kinds of litigation, even a bad settlement may be more advantageous in the long run than a good lawsuit.

*Id.* 499 U.S. at 81, 111 S.Ct. at 1137; *see also Mock v. T.G. & Y. Stores Co.,* 971 F.2d 522, 531 (10th Cir.1992) ("Simply showing that the Union did not represent [its member] as vigorously as it could have does not establish a section 301 violation.").

In contrast to the factual and legal landscape in *ALPA,* we have upheld a jury determination that a union breached its duty of fair representation when it not only failed to negotiate with the employer on behalf of its members, but also clandestinely entered into a side agreement with the employer that allowed the employer to reopen a closed plant as a nonunion operation and that waived all rights and claims that the employees would have against the employer. *Aguinaga,* 993 F.2d at 1468–71. In *Aguinaga,* the employer announced its plans to close a meat packing plant at which the plaintiffs worked. Without informing its members, the

---

**9.** Pursuant to the union's agreement with the airline, the striking pilots faced three alternatives. First, pilots could settle any outstanding claims with Continental and participate in a bidding system to obtain a new assignment as a Captain, First, or Second Officer. Second, pilots could elect not to return to work and receive a severance of $4,000 per year of service (or

$2,000 per year if the pilot had been furloughed before the strike commenced). Or third, pilots could pursue any individual claims against Continental and gain eligibility to return to work only after all the pilots who pursued the first option received reinstatement. *ALPA,* 499 U.S. at 67–70, 111 S.Ct. at 1130–31.

union entered into the secret agreement described above. The evidence revealed that the union failed to protect its members' interests, bartered away any means the members might have had to protect themselves, and concealed its activities in the hope of becoming the bargaining representative for the reopened plant.

Here, Local 115 and CWA initiated a grievance against NAC to protect all composing room employees. Unlike the institutional self-protectionist motives of the union in *Aguinaga*, the unions in the instant case took the initial position that the existing bargaining agreement governed the Oak Room and that NAC must therefore give hiring priority to the Plaintiffs and their composing room colleagues. To that end, the unions attempted to negotiate on behalf of all its members, filed a formal grievance, and pursued arbitration.

Unfortunately for the union, however, the expiration of the collective bargaining agreement on December 31, 1986 markedly weakened its negotiating position inasmuch as the parties agreed to preserve the agreement only on a day-to-day basis. Moreover, NAC showed no signs of retreating from its conviction that the Oak Room constituted a new department and thus fell outside the scope of the collective bargaining agreement. Despite numerous overtures by the unions, NAC refused to displace the employees trained and hired for the Triple I equipment and apparently identified this as a nonnegotiable issue. NAC also responded to the union's demands by filing a unit clarification petition with the NLRB. Even if Local 115 prevailed in arbitration or before the NLRB, NAC could render such victories hollow by terminating the collective bargaining agreement.

Given the unions' uncertain likelihood of success in arbitration and before the NLRB, and the uncontroverted fact that the Triple I automation would render numerous composing room jobs obsolete, the union negotiators did not act irrationally in arriving at the ultimate settlement agreement. *ALPA*, 499 U.S. at 80–82, 111 S.Ct. at 1137; *Adcox v. Teledyne, Inc.*, 21 F.3d 1381, 1388 (6th Cir.) ("Union's actions in negotiating and getting

ratified the Plant Closing Agreement were not irrational, in view of its belief that litigation would result and that its chances of prevailing were uncertain."), *cert. denied,* —— U.S. ——, 115 S.Ct. 193, 130 L.Ed.2d 126 (1994). That is, the regrettable consequences of the Triple I automation for non-job guarantee holders such as the Plaintiffs did not result from any irrational or nonsensical actions of union negotiators, but instead from a rational, if painful, compromise. *See Bovers v. Flying Tiger Line, Inc.*, 979 F.2d 291, 298 (2d Cir.1992) (The fact that an agreement between the airline and the union left pilots over 60 years of age in a disadvantaged position did "not mean that their interests were not fairly defended by their union [because] [t]he weak position in which they ended was a consequence of the weak position from which they began.").

**(b) Discriminatory Standard**

The Plaintiffs next assert that Local 115 and CWA intentionally discriminated against them during negotiations by ignoring their interests and favoring the job guarantee holders. We disagree.

"A union's discriminatory conduct violates its duty of fair representation if it is 'invidious.'" *Aguinaga*, 993 F.2d at 1470. The genesis of the cause of action for invidious discrimination was *Steele*, in which a group of black locomotive firemen alleged that the all-white union that represented their bargaining unit intentionally sought to replace the black workers with white union members. *Steele*, 323 U.S. at 194–96, 65 S.Ct. at 228–29. The Supreme Court held that union officials may not discriminate based on the "obviously irrelevant and invidious" basis of the race of its members when negotiating contract modifications with the employer. *Id.* at 203, 65 S.Ct. at 232. However, the Court explained that a union does not engage in invidious discrimination when it negotiates a contract whose terms vary according to the seniority and skill level of union members and thus unfavorably affect some of its members. *Id.*

Thus, discrimination is invidious if based upon impermissible or immutable classifications such as race or other constitution-

ally protected categories, or arises from prejudice or animus. *Id.; Ford Motor,* 345 U.S. at 337, 73 S.Ct. at 685–86 ("a union's obligation to represent all members ... requires them to make an honest effort to serve the interests of all of those members, without hostility to any"); *cf. Plyler v. Doe,* 457 U.S. 202, 216–17, 102 S.Ct. 2382, 2394–95, 72 L.Ed.2d 786 (1982) (defining as "presumptively invidious those classifications that disadvantage a 'suspect class,' or that impinge upon the exercise of a 'fundamental right' "). *See also* Martin H. Malin, *The Supreme Court and the Duty of Fair Representation,* 27 Harv.C.R.–C.L.L.Rev. 127, 185 (1992) (concluding that the Supreme Court "initially developed the duty of fair representation to afford a pre-Civil Rights Act remedy for racial discrimination" against union members). In contrast, classifications according to the seniority and skill level or other employment-related criteria of union members are relevant, rational, and often inevitable. *Steele,* 323 U.S. at 203, 65 S.Ct. at 232. *See also Ford Motor,* 345 U.S. at 338, 73 S.Ct. at 686:

> Inevitable differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected.

Consistent with this notion of invidious discrimination, the Eighth Circuit recently held that a group of female union members presented sufficient evidence that its union intentionally and invidiously engaged in gender discrimination to overcome the union's summary judgment motion. *Carter v. United Food and Commercial Workers, Local No. 789,* 963 F.2d 1078, 1082 (8th Cir.1992). In *Carter,* the union represented meat wrappers and meat cutters employed at the Country Club Market. Every meat wrapper was female and every meat cutter was male. A group of meat wrappers alleged that the union breached its duty of fair representation by seeking benefits for the meat cutters at the meat wrappers' expense. To buttress their claim, the plaintiffs presented evidence both that union officials only perfunctorily advanced meat wrappers' interests and that the officials made overtly discriminatory statements about meat wrappers. Noting that the plaintiffs belonged to a protected class under Title VII of the Civil Rights of Act 1964, the court concluded that the plaintiffs had established a genuine issue of fact as to whether the union engaged in invidious gender discrimination. *Id.* at 1082.

In contrast to *Steele* and *Carter,* the record in the instant case does not support the Plaintiffs' allegations that Local 115 and CWA had any discriminatory animus toward Plaintiffs or that the Plaintiffs comprise a protected group. During the entire negotiations, NAC emphatically refused to agree to any settlement that would allow composing room employees to displace the twelve non-composing room employees that NAC had trained to work on the Triple I machine. In return for agreeing to allow NAC to retain these twelve employees, Local 115 and CWA won the concession to extend the bargaining unit to include Oak Room employees and secured the right of bargaining unit members to avoid a layoff by transferring to other positions. That the Plaintiffs were unable to secure positions in the Oak Room arose not from the unions' alleged discrimination against them, but from NAC's decision to hire more senior job guarantee holders. *Steele,* 323 U.S. at 203, 65 S.Ct. at 232; *see also ALPA,* 499 U.S. at 80–82, 111 S.Ct. at 1137 (rejecting claim that union discriminated against striking pilots, to the benefit of nonstriking pilots, because it was "rational" for the union to accept a compromise that allocated positions between the two groups of pilots).

Further, the unions' final settlement agreement with NAC appears to accord hiring preference to *all* composing room employees. Aplt.App. at 670B ("Applicants from the composing room, who are currently employed in the composing room, shall be hired over all non-unit applicants if their skill, ability, and experience are equal to or better than the non-unit applicants."). Those Plaintiffs who had been laid off in December 1987 may have been unable to benefit from the preferential hiring agreement, but this circumstance resulted from the fact that

NAC laid off the least senior composing room employees, not from any invidiously discriminatory conduct by the unions.

The Plaintiffs additionally assert that Local 115 and CWA negotiators favored more senior union members to the detriment of non-job guarantee holders. First, the Plaintiffs allege that union officials negotiated "extra-contractual benefits, such as an extra year of pension contributions in case of future layoffs," for every union member except the Plaintiffs. Aplt.Br. at 23. To support this assertion, the Plaintiffs rely solely on testimony by Local 115's counsel that he "believe[d]" the parties had "agreed in concept" to a lump sum pension contribution for job guarantee holders "who severed their employment." Aplt.App. at 604. However, the final settlement agreement provides no such preferential treatment to all union members except the Plaintiffs. To the contrary, the agreement states that "*all* composing room employees" whose jobs are eliminated and who *transfer to a non-bargaining unit position with a reduced salary*, shall receive from NAC a lump sum pension plan payment equal to one year's contribution. Aplt.App. at 670E. As with the preferential hiring agreement, we find no evidence in the record that the union's purposefully sought to exclude the laid off Plaintiffs from this lump sum pension payment based on an impermissible or irrational classification of union members.

Similarly unavailing is the Plaintiffs' second assertion that the unions favored job guarantee holders by securing a $1,640 settlement bonus for the eight job guarantee holders who transferred to Triple I positions. This so-called bonus to the eight job guarantee holders who secured Triple I positions arose from NAC's agreement to compensate these employees for the reduction in pay they experienced as a result of their transfer to the lower-paying Triple I positions.[10] This bonus thus was nothing more than NAC's partial satisfaction of Section 6 of Supplemental Agreement A to the collective bargaining agreement, which applied only to job guarantee holders who obtained internal transfers.

Accordingly, the Plaintiffs fail to provide sufficient evidence to create a genuine issue of material fact that Local 115 and CWA invidiously discriminated against them based on an impermissible classification.[11] Indeed, we find no indication in the record that Local 115 and CWA acted with animus toward the Plaintiffs or purposefully sought to disenfranchise them.

**(c) Bad Faith Standard**

 Lastly, the record does not support the Plaintiffs' assertion that Local 115 and CWA acted in bad faith. "Bad faith requires a showing of fraud, or deceitful or dishonest action." *Aguinaga*, 993 F.2d at 1470.

The Plaintiffs allege that union officials "met secretly" with NAC management; suggested means of reaching a settlement without the knowledge of the rank and file members; did not include the side agreement concerning training rights to the overall settlement agreement until after the members had approved the settlement agreement; and led the Plaintiffs to believe that their grievances would be preserved.

These claims, considered individually and collectively, do not establish bad faith and are not supported by the appellate record. Although Local 115 members may have been unaware of the preliminary meetings involving CWA and NAC, and the purported initial settlement proposals, this initial lack of communication was obviated by the fact that all members of Local 115 were given the opportunity to vote on the proposed settlement agreements. Also, nothing in the record suggests that CWA officials secretly bartered away Local 115's interests. To the contrary, the CWA officials informed NAC management that they merely advised Local 115, and that Local 115 representatives must participate in settlement negotiations. The president and vice president of Local 115

---

**10.** NAC paid Triple I operators between $8.50 and $10.75 per hour, whereas the hourly pay in the composing room was $12.47.

**11.** The record indicates that Plaintiff John L. Mittelstedter, a non-job guarantee holder, served as a Local 115 representative during the first four meetings between the union and NAC.

attended the August 20, 1987 meeting with NAC and CWA and all subsequent meetings, and actively participated in the drafting of the settlement agreement.

Whereas the union negotiators in *Aguinaga* concealed their actions and the side agreements from their members, here Local 115 and CWA explained the contents of the settlement agreement, answered members' questions, and informed members that outstanding grievances would be listed on Attachment A to the settlement agreement. Local 115 invited all members to specify any grievances for inclusion in Attachment A and only one member specifically identified a grievance—the so-called training grievance filed by the Local 115 Chapel Chairman on January 19, 1988. Attachment A contained this grievance. Thus, from these facts we find no evidence of bad faith conduct.

The Plaintiffs next assert that a February 1988 Local 115 Bulletin misled the members into believing that union representatives were continuing to pursue arbitration when, in fact, settlement talks continued. The Bulletin stated:

> As for our arbitration action. Well, nothing new to report here, only that our sector counsel and ITU rep have the matter in hand. Hoping a timetable from Richard Rosenblatt will be forthcoming. In the meantime, your officers are in a holding pattern. We cannot move with the legal advice we have.

Aplt.Br. at 10. However, the plain language of this bulletin refutes the Plaintiffs' contention. And the Plaintiffs offer no evidence to suggest either that arbitration and settlement talks were mutually exclusive options.

Further, the Plaintiffs do not suggest that this bulletin in any way injured them by prompting them to take, or to abstain from taking, action to protect their interests. *See Ackley v. Western Conference of Teamsters,* 958 F.2d 1463, 1472 (9th Cir.1992) ("Union members may maintain an action for a breach of the duty of fair representation

based on misrepresentations" *only if* they "demonstrate a 'causal relationship between the alleged misrepresentations and their injury.' ") (quoting *Acri v. Int'l Ass'n of Machinists,* 781 F.2d 1393, 1397 (9th Cir.), *cert. denied,* 479 U.S. 816, 107 S.Ct. 73, 93 L.Ed.2d 29 (1986)). Even accepting as true the Plaintiffs' characterization of this bulletin, Local 115 and CWA did not deceive the members about the negotiations or their bargaining strategy. For this reason, the Plaintiffs' reliance on *Thomas v. Bakery, Confectionery and Tobacco Workers Union Local No. 433,* 826 F.2d 755, 758–61 (8th Cir.1987), *cert. denied,* 484 U.S. 1062, 108 S.Ct. 1019, 98 L.Ed.2d 984 (1988), ignores a critical component in the jury's finding in *Thomas* that is absent from the record in the instant case: there, the union officials affirmatively lied to their members about failing to negotiate with the employer to protect the plaintiffs' seniority rights and not representing their interests fairly at arbitration.[12]

Furthermore, the Plaintiffs offer no evidentiary support for their assertion that union officials deceivingly led them to believe that their grievances would be preserved. The portion of the appellate record to which the Plaintiffs refer for this allegation is the testimony from one employee, not a Plaintiff in this action, in which he describes his assumptions about the contents of the settlement agreement. And, the Plaintiffs do not dispute that copies of the agreement were distributed to union members prior to the March 1988 vote. Nor do the Plaintiffs suggest that they identified a particular grievance for inclusion in Attachment A to the settlement agreement that union officials failed to include.

In sum, the Plaintiffs have failed to produce sufficient evidence to create a material fact question as to whether Local 115 and CWA engaged in arbitrary, discriminatory, or bad faith conduct during the negotiations with NAC. We therefore affirm the district court's summary judgment order in favor of Local 115 and NAC.

---

12. In *Thomas,* one plaintiff testified that, when he asked a union official about the status of an impending sale of the bakery at which he worked, the official assured him, "Don't worry, we had our jobs." *Thomas,* 826 F.2d at 759.

Additional evidence supported the jury's determination that the same union official lied to the plaintiff by telling him that the sales contract would be submitted to the arbitrator when, in fact, it was not. *Id.* at 761–62.

## B. Age Discrimination

We next consider the Plaintiffs' appeal from the district court's denial of their Rule 50 motion for judgment as a matter of law and Rule 59 request for a new trial on the age discrimination claim against NAC. Only Plaintiffs McBride, Bex, Meyer, and Mittelstedter bring this appeal.

### 1. Standard of Review

 We review de novo the denial of a motion for judgment as a matter of law. *Bayless v. Christie, Manson & Woods Int'l, Inc.*, 2 F.3d 347, 351 (10th Cir.1993). We will only find error in the denial of a Rule 50 motion "if the evidence conclusively favors the moving party and is susceptible to no reasonable inferences that would sustain the nonmoving party's position." *Whalen v. Unit Rig, Inc.*, 974 F.2d 1248, 1251 (10th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1417, 122 L.Ed.2d 787 (1993). In our appellate review, we can neither assess the credibility of witnesses nor substitute our judgment for that of the jury. *Id.* Instead, we must view the evidence most favorably to NAC, the party against whom the Rule 50 motion was made, and give NAC the benefit of all reasonable inferences from the evidence. *Brown v. McGraw–Edison Co.*, 736 F.2d 609, 613 (10th Cir.1984).

### 2. Analysis

After a three-week trial, the jury concluded that, although the Plaintiffs proved that they had applied for a Triple I position, each Plaintiff failed to prove by a preponderance of the evidence that age was a determinative factor in NAC's decision not to hire him or her.[13] Consistent with the three-step analytical framework set out in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Plaintiffs satisfied step one by stating a prima facie case of age discrimination.

 At issue in this appeal is whether NAC met its burden of production under step two of the *McDonnell Douglas* test by presenting a "legitimate, nondiscriminatory reason" for not hiring the Plaintiffs for the Oak Room, *id.* at 802, 93 S.Ct. at 1824, and if so, whether the Plaintiffs in turn satisfied step three by ultimately proving that they were the victims of intentional age discrimination—either by direct proof or indirectly by showing that the employer's proffered explanation was a pretext for age discrimination. *St. Mary's Honor Center v. Hicks*, —— U.S. ——, ——, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993). The Plaintiffs contend that NAC failed to meet its burden of production under step two.

 To assess whether NAC satisfied its burden of production, we are guided by the principles articulated in *E.E.O.C. v. Flasher*, 986 F.2d 1312, 1316 (10th Cir.1992):

> The defendant's burden is merely to articulate through some proof a facially nondiscriminatory reason for the [failure to hire]; the defendant does not at this stage of the proceedings need to litigate the merits of the reasoning, nor does it need to prove that the reasoning relied upon was bona fide, nor does it need to prove that the reasoning was applied in a nondiscriminatory fashion.... However, the proffered reason for the action [or inaction] ... must be reasonably specific and clear.

Furthermore, the defendant need not explain "any differences in treatment between the plaintiff and others." *Id.* at 1318.

 If the plaintiff has met his or her burden under step one by stating a prima facie case, and the defendant in turn fails to meet its burden of production by not offering *any* facially nondiscriminatory explanation for its action against the plaintiff, then the court must award judgment to the plaintiff as a matter of law. *Hicks*, —— U.S. at ——, 113 S.Ct. at 2748; *Flasher*, 986 F.2d at 1319. On

---

**13.** Both below and on appeal, the parties dispute whether the Plaintiffs timely filed their age discrimination claims. *Aronson v. Gressly*, 961 F.2d 907, 911 (10th Cir.1992) (A "timely filing with the EEOC is a prerequisite to a civil suit under both the ADEA, 29 U.S.C. § 626(d), and Title VII."). When NAC raised timeliness as a de-

fense, the district court reserved on the question and declared it moot when the jury ruled in favor of NAC.

Because we affirm the court's denial of the Plaintiffs' Rule 50 and 59 motions, we do not resolve whether the Plaintiffs timely filed their ADEA claim.

the other hand, so long as the defendant proffers a facially nondiscriminatory explanation, regardless of its persuasive effect, "the presumption in plaintiff's favor that arose from the establishment of a prima facie case simply 'drops from the case'" and we proceed to the ultimate question for the factfinder: has the plaintiff proven by a preponderance of the evidence that the employer intentionally discriminated against him or her on the basis of age? *Id.* at 1316 (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 255 n. 10, 101 S.Ct. 1089, 1095 n. 10, 67 L.Ed.2d 207 (1981)); *Hicks*, —— U.S. at ——, 113 S.Ct. at 2749. The factfinder's disbelief of the employer's proffered rationale *permits* the factfinder "to infer the ultimate fact of intentional discrimination," but it does not *compel* judgment for the plaintiff. *Hicks*, —— U.S. at ——, 113 S.Ct. at 2749. To hold otherwise would ignore that the plaintiff bears the ultimate burden of persuading the factfinder that the employer intentionally discriminated on the basis of age. *Id.*

Here, the record demonstrates that NAC presented specific nondiscriminatory explanations for not hiring Plaintiffs McBride, Meyer, Bex, and Mittelstedter for the Oak Room. Both McBride and Meyer purportedly applied for Oak Room positions in August and September 1986, during what NAC referred to as Phase One of the Oak Room hiring process. During Phase One, NAC was anxious to begin using the Triple I equipment before the busy Thanksgiving and Christmas advertising season. Accordingly, NAC management not only posted announcements for the positions, but also personally invited certain employees to apply. As NAC's Production Manager, Glenn Webb oversaw the installation of the Triple I and was in charge of hiring. Webb described the Phase One hiring as somewhat unstructured, hurried, and based on his personal knowledge of employees' skills and experience.[14]

At trial, Webb testified that he was unaware that McBride and Meyer had applied for Triple I positions. With respect to Mey-

er, two other NAC officials who participated in the hiring decisions, Bill Northrup and Jerry Norman, also testified that they did not know of Meyer's application. Additionally, Webb testified at trial that he handpicked certain employees based on his knowledge of their qualifications, experience, and seniority.

Plaintiffs Bex and Mittelstedter purportedly applied in February 1987, during Phase Two of NAC's Oak Room hiring. Unlike the informal hiring conducted during Phase One, the hiring during Phase Two was more structured and applicants were required to take spelling, typing, and layout tests. Webb testified that he never knew that Bex and Mittelstedter completed spelling, typing, and layout tests or that they were seeking Oak Room positions. Northrup and Norman also were unaware that Bex and Mittelstedter had applied for or expressed interest in an Oak Room position. In fact, Webb testified that he had asked Mittelstedter to apply, but never learned whether Mittelstedter pursued an application.

In its special verdict, the jury found that although all four Plaintiffs had "applied" for Oak Room positions, they failed to prove by a preponderance of the evidence that age was a determinative factor in NAC's decision not to hire them. The jury concluded that the Plaintiffs made enough of an effort in making known their interest in being considered for jobs in the Oak Room that they should be deemed to have applied for such jobs. However, the record shows considerable ambiguity in the Plaintiffs' applications process and sufficient explanations for the reasons why NAC conducted its hiring procedures as it did and hired who it did that we cannot conclude that the jury erred in the ultimate fact determination that NAC did not intentionally discriminate on the basis of age. After assessing the credibility of all the witnesses, the jury concluded that NAC's explanations were not pretexts for unlawful age discrimination.

The Plaintiffs' reliance on *Bell v. AT & T*, 946 F.2d 1507 (10th Cir.1991), and *E.E.O.C. v. West Brothers Dep't Store*, 805 F.2d 1171

---

**14.** In fact, NAC management did not require any employees selected during Phase I to take spelling, typing, or layout tests, whereas such tests were administered during Phases Two and Three.

(5th Cir.1986), as authority for judgment as a matter of law in their favor is misplaced. In *Bell,* we held that the district court committed reversible error by preventing the plaintiff from calling a witness to rebut the employer's proffered explanation for terminating the plaintiff during a reduction-in-force. *Bell,* 946 F.2d at 1512 ("Where the rebuttal testimony goes directly to the issue of pretext under the test set forth in *McDonnell Douglas,* we hold that it is an abuse of discretion for the trial court to exclude such evidence."). We further held that the trial court cannot rely exclusively on the testimony of a plaintiff's witness to surmise a justification for the employer's action that the employer never articulated at trial. *Id.* at 1513. This is the same conclusion that the Fifth Circuit reached in *West Brothers,* 805 F.2d at 1173, where the employer remained silent in the face of the plaintiffs' prima facie case.

Yet, the Plaintiffs in the instant case can point to no evidence in the record to show that the district court either denied them the opportunity to introduce witnesses to rebut NAC's explanation or crafted its own reason for NAC's refusal to hire that NAC never proffered. Because we conclude that the evidence neither conclusively favors the Plaintiffs nor completely lacks reasonable inferences that would sustain NAC's position, we affirm the court's denial of the Plaintiffs' Rule 50 motion for judgment as a matter of law. *Bayless,* 2 F.3d at 351.

For the same reasons, we hold that the court did not abuse its discretion in denying the Plaintiffs' Rule 59 motion for a new trial. *Black v. Hieb's Enterprises, Inc.,* 805 F.2d 360, 363 (10th Cir.1986) (explaining that an abuse of discretion exists if "the verdict is clearly, decidedly, or overwhelmingly against the weight of the evidence").

### C. Jury Instructions

The Plaintiffs lastly argue that the court erred in refusing to deliver three of the Plaintiffs' proposed jury instructions and instead gave instructions that misguided the jury in considering the age discrimination claim.

### 1. Standard of Review

 In reviewing jury instructions, "we consider all the jury heard, and from the standpoint of the jury, decide not whether the charge was faultless in every particular, but whether the jury was misled in any way and whether it had understanding of the issues and its duties to determine these issues." *Resolution Trust Corp. v. Stone,* 998 F.2d 1534, 1549 (10th Cir.1993) (quotation and citation omitted). "[N]o particular form of words is essential if the instruction as a whole conveys the correct statement of the applicable law." *Faulkner v. Super Valu Stores, Inc.,* 3 F.3d 1419, 1424 (10th Cir.1993) (quotation omitted). "An erroneous jury instruction requires reversal 'only if we have substantial doubt whether the instructions, taken together, properly guided the jury in its deliberations.'" *Id.* (quoting *Mitchell v. Mobil Oil Corp.,* 896 F.2d 463, 468 (10th Cir.), *cert. denied,* 498 U.S. 898, 111 S.Ct. 252, 112 L.Ed.2d 210 (1990)).

### 2. Analysis

#### (a) Proposed Jury Instruction No. 3

 The plaintiffs requested the court to instruct the jury that the employer could violate ADEA even though the replacement employees who were hired were themselves over 40 years old. The Plaintiffs' proposed instruction provided:

> In order to reach a verdict for plaintiffs, it is not necessary that you find that plaintiffs were denied employment in the disputed jobs in favor of persons under the age of forty years. You need only find that the disputed jobs were filled with persons younger than plaintiffs.

The Plaintiffs argue that this instruction was necessitated by NAC's repeated attempts to demonstrate that it hired employees for the Oak Room who were over age 40.

 However, the final sentence of the Plaintiffs' tendered instruction would impose per se liability if an employer hires anyone younger than the Plaintiffs. The law is to the contrary; the plaintiff must show that age was a dispositive factor in the employer's decision not to hire that plaintiff. 29 U.S.C.

§ 623(a)(1). As the Tenth Circuit recently explained,

> The essence of the correct formulation of the standard of proof is that it requires the jury to focus on the effect of the factor of age. The jury must understand that it is not enough that age discrimination figure in the decision to demote or discharge; age must 'make a difference' . . . in the sense that, "but for" the factor of age discrimination, the employee would not have been adversely affected.

*Faulkner*, 3 F.3d at 1425 (quotation omitted). Because the court in the instant case conveyed these basic principles of an ADEA claim, we see no reversible error in the district court's refusal to give the jury instruction as tendered.[15]

**(b) Proposed Instruction No. 4**

 The Plaintiffs next argue that the court wrongly neglected to advise the jury about the shifting burden of proof. Specifically, the Plaintiffs proposed the following:

> If you find that plaintiffs have produced direct evidence that age was a determinative factor in NAC's decision to deny any plaintiff employment in a disputed position, you must enter a verdict for the plaintiff unless NAC proves by a preponderance of the evidence that it would have taken the same action regardless of that plaintiff's age.

15. In relevant part, the district court instructed the jury as follows:

> *Jury Instruction No. 16*
> In order to prevail on his or her claim, each plaintiff must prove, by a preponderance of the evidence:
> First: that the plaintiff was within the protected age group, that is, he or she was forty years of age or older;
> Second: that there was a job opening;
> Third: that the plaintiff applied for and was qualified to perform the position in question;
> Fourth: that the plaintiff was not hired by the defendant; and
> Fifth: that the plaintiff's age was one of the determinative reasons that prompted defendant to not hire plaintiff.
> *Jury Instruction No. 17*
> A "determinative factor" as used in the fifth requirement means that but for the motive of the defendant to discriminate against a plaintiff because of his or her age, alone or in

The Plaintiffs rely on *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), in urging this jury instruction. *Price Waterhouse* was a mixed motive case in which the Supreme Court held that, once a plaintiff had established with direct evidence that gender was a factor in the employment decision, the burden shifted to the employer to prove by a preponderance of the evidence "that it would have made the same decision even if it had not allowed gender to play such a role." *Id.* at 244–45, 109 S.Ct. at 1788.

However, NAC did not invoke the "mixed motive defense" and instead argued that age was simply not a factor in its Oak Room hiring decisions. By instructing the jury that the Plaintiff had the burden of proving that age was a determinative factor, the court's instruction conveyed the correct statement of the applicable law.[16] *Faulkner*, 3 F.3d at 1425–26; *see also Furr v. AT & T Technologies, Inc.*, 824 F.2d 1537, 1549–50 (10th Cir.1987) (rejecting challenge to jury instruction in ADEA claim that stated: "what each plaintiff must prove is that the plaintiff's age was a determining factor why the defendant failed to promote him.").

**(c) Proposed Instruction No. 7**

 The Plaintiffs' third proposed instruction addressed the jury's consideration of statistical evidence presented at trial. The Plaintiffs proposed the following:

> combination with all other factors, that plaintiff would have been hired by defendant. In other words, you must find that the plaintiff's age was at least one of several determinative factors in the defendant's decision not to hire the plaintiff for an AMS position. A determinative factor need not be the sole or exclusive motivation for the decision made by the defendant.

16. The court's instructions were conceivably more favorable to the Plaintiffs than the Plaintiffs' own proposed instruction. The court instructed that "if you are so convinced [that NAC discriminated against the plaintiff because of age], you should find for that plaintiff and then determine that amount of damages that particular plaintiff has sustained." Jury Instruction No. 18. In essence, this is a *Price Waterhouse* instruction, but without the limiting factor of the employer's opportunity to show it would not have hired the plaintiff even without considering age.

In determining whether age was a determinative factor ... you may consider statistical evidence. In fact, statistical evidence alone may be sufficient for you to find that age was a determinative factor in denying plaintiffs employment....

In place of this proposed language, the court delivered the following instruction:

*Jury Instruction No. 12(a)*

You have been provided statistical evidence by both parties. The usefulness or weight of statistical evidence depends on all the surrounding facts and circumstances. Like any other type of evidence, statistical evidence must not be accepted uncritically ... You should give the statistical evidence presented in this case the weight and value you think it deserves.

The Plaintiffs argue that the court's instruction failed to guide the jury about the legal standard for evaluating statistics of age discrimination and disparaged the value of the Plaintiffs' statistical evidence. However, we believe that the instruction given was adequate, and there was no reversible error in declining to give Plaintiffs' instruction on this matter.

**(d) The court's burden of proof instruction**

 The Plaintiffs finally argue that the court erroneously instructed the jury about the parties' burden of proof. Because the Plaintiffs did not object at trial to the court's instruction, we review the instruction for plain error. *U.S. v. Meek*, 998 F.2d 776, 779 (10th Cir.1993). "To constitute plain error, the district court's error must have been both obvious and substantial." *Id.* (quotation omitted).

The Plaintiffs object to Jury Instruction No. 16 on the grounds that it fails to inform the jury that the Plaintiffs could prevail if NAC's proffered explanation for failure to hire lacks credibility. However, the key question for the jury was whether NAC's decision not to hire the Plaintiffs was based on age and the judge's instruction correctly recited the elements of an age discrimination claim. *Faulkner*, 3 F.3d at 1424. In fact, the Plaintiffs' proposed instruction risks misguiding the jury about the principle articulat-

ed in *Hicks* that the mere disbelief of the employer's explanation does not compel judgment for the plaintiff. If a jury chooses to believe that a proffered explanation is pretextual, the jury must still go on to decide whether it is a pretext *for* discrimination. The jury instructions as given were adequate.

Accordingly, we do not find plain error in the court's instruction.

### III. CONCLUSION

For the reasons stated, we AFFIRM.

