Annabelle CARTER; Deanne Dahl; Paula Rust; Ellen Seidel; Florence Thurmer; Lorraine Tyler; Appellants,

v.

**UNITED FOOD AND COMMERCIAL WORKERS, LOCAL NO. 789,**
**Appellee.**

No. 91–2391.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 4, 1991.

Decided May 6, 1992.

Rehearing and Rehearing En Banc
Denied June 12, 1992.

---

James H. Ranum, Minneapolis, Minn., argued (James H. Ranum, Minneapolis, Minn. and Linda A. Miller, St. Paul, Minn., on brief), for appellants.

Roger Andrew Jensen, St. Paul, Minn., argued (Roger A. Jensen and Carol A. Baldwin, on brief), for appellee.

Before LAY,* Chief Judge, HEANEY, Senior Circuit Judge, and LOKEN, Circuit Judge.

HEANEY, Senior Circuit Judge.

United Food and Commercial Workers Local 789 (the union) represents nearly all grocery store employees in the St. Paul area, including employees of Country Club Market, Inc. (Country Club). The master agreement between the union and the St. Paul area grocery stores classifies meat department employees as either meat cutters or meat wrappers. Meat cutters are skilled workers who have completed an apprenticeship program or have vocational training. The union contract permits them to perform any duty in the meat department. In contrast, meat wrappers are unskilled workers whose duties are restricted primarily to weighing and wrapping meat, cutting cheese and cleaning machinery. During the 1980s, cutters earned about two dollars more per hour than wrappers. Every Country Club meat wrapper was female, and every cutter was male.

Until they were laid off between December 1983 and February 1985, the plaintiffs worked as meat wrappers in various Country Club stores in and around St. Paul. During the period that they worked at Country Club they were represented by the union. In this action, the plaintiffs charge the union with discriminating against its female members (the wrappers) during negotiations between the union and the multi-employer bargaining group [1] in violation of Title VII, 42 U.S.C. § 2000e–2(c), and the Minnesota Human Rights Act, Minn.Stat. § 363.01 et seq.[2]

The union first moved for summary judgment in August 1989. The court denied the union's motion, finding that the "[p]lain-

---

* The Honorable Donald P. Lay was Chief Judge of the United States Court of Appeals for the Eighth Circuit at the time this case was submitted and took senior status on January 7, 1992, before the opinion was filed.

1. The amended complaint alleges other instances of discrimination as well. At the time of the union's second motion for summary judgment, however, the district court found that the plain-

tiffs had abandoned all discrimination claims except for those involving the negotiation of the collective bargaining agreements.

2. The state and federal claims are considered under the same standards. See Hubbard v. United Press Int'l, 330 N.W.2d 428, 441 (Minn. 1983).

tiffs have presented sufficient evidence to demonstrate a fact dispute on whether the union's conduct of its affairs was discriminatory and constituted a breach of its duty of fair representation." In support of its holding, the court noted that

[t]he conduct of union officials and their statements, when reviewed in plaintiff's favor, do suggest that meat wrappers may have been treated differently than meat cutters because of their sex. Comments by union officials that they had to "protect the men's jobs" suggest that wrapper's job protections might have been sacrificed in exchange for meat cutters' jobs. The deposition transcripts and affidavits contain many instances of overt discrimination.

The union did not attempt to appeal the district court's order.

In March 1991, the Supreme Court clarified the standard of review for union activity in contract negotiations. *Air Line Pilots Ass'n (ALPA) v. O'Neill*, —— U.S. ——, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991). *ALPA* involved the resolution of a strike against Continental Airlines by its pilots union (ALPA). Over the course of the two year strike, about 400 striking pilots returned to work, and the airline hired about 1000 more replacements. Shortly before the strike ended, there were 1600 working pilots and only 1000 strikers. *Id.* at 1130. ALPA eventually negotiated a settlement under which, among other provisions, the working pilots were allocated more Captain positions than those pilots who had remained on strike until the end. A group of former striking pilots sued the union for breach of the duty of fair representation in negotiating the settlement with Continental.

The *ALPA* Court held that the "tripartite standard" of *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967) applies to all union activity, including contract negotiations. *ALPA*, 111 S.Ct. at 1135. Under *Vaca*, a union breaches its duty of fair representation if its actions are either "arbitrary, discriminatory, or in bad faith." *Vaca*, 386 U.S. at 190, 87 S.Ct. at 916. The *ALPA* court further held "that a union's

actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational." *ALPA*, 111 S.Ct. at 1130 (citation omitted). In a separate analysis of the plaintiffs' discrimination claim, the court stated that

If we are correct in our conclusion that it was rational for ALPA to accept a compromise between the claims of the two groups of pilots . . ., some form of allocation was inevitable. A rational compromise on the initial allocation of the positions was not invidious "discrimination" of the kind prohibited by the duty of fair representation.

*ALPA*, 111 S.Ct. at 1137.

In April 1991, the union renewed its motion for summary judgment based on the theory that, under *ALPA*, the court owed greater deference to the union's conduct. The district court agreed, stating that *ALPA*

leads to the conclusion that the claims against the Union for discrimination in collective bargaining should be dismissed. . . . Under [*ALPA*], a union's decision-making in collective bargaining is held to the same standard of review as a legislature enacting laws. In light of the Union's proposals on behalf of meat wrappers in the 1983 negotiations and its agreement to gradual expansion of meat wrapper duties, the Union's action was within a "wide range of reasonableness."

The plaintiffs appealed the district court's judgment, presenting us with the issue of whether the *ALPA* decision gave the district court sufficient justification to reverse its initial denial of the union's motion for summary judgment. We think not.

We review de novo a district court's grant of summary judgment. *Robinson v. Monaghan*, 864 F.2d 622, 624 (8th Cir. 1989). Where, as here, the defendant moved for summary judgment, we must review the evidence in the light most favorable to the plaintiffs. *See id.* Through depositions and affidavits, the plaintiffs al-

lege pervasive discrimination against women in the retail meat industry by their union, their male coworkers, and their employer.[3]

The unfair representation complained of here centers on the negotiation of the collective bargaining agreement between the union and the St. Paul area grocers in 1980 and 1983. The plaintiffs claim that during these negotiations, the union merely "went through the motions" of protecting the meat wrappers' interests, and in fact sought benefits for the meat cutters at the wrappers' expense. For example, the plaintiffs list three benefits that would have strengthened the wrappers' job security: an expansion of meat wrapper duties; "red-circling" of wrapper positions, which would have protected each position from elimination until the "red-circled" wrapper retired, quit, or was fired; and "dovetailing" or combining the wrappers' and cutters' seniority lists into one. While the record suggests that the union proposed both "red-circling" and "dovetailing," the plaintiffs fault the union for not vigorously pursuing those options, and for failing to find other means of protecting the wrappers' jobs when the employers rejected the union's proposals. Moreover, although the wrappers' duties were gradually expanded, the record indicates that the employers, rather than the union, first proposed the expansion. As a result of the union's alleged half-hearted bargaining on behalf of the wrappers, the plaintiffs contend that when Country Club began laying off meat department employees in the mid 1980s, a disproportionate number of women lost their jobs.[4]

As evidence that bias against women was behind the union's failure to fairly represent them, the plaintiffs offer proof of overtly discriminatory statements by union officials and other male union members:[5]

* Ellen Seidel, one of the plaintiffs, testified at her deposition that a head meat cutter continually referred to her as an "old woman" and a "wench." Seidel also stated that whenever she complained to the meat cutter about his harassment, he would respond "Oh, she's a woman's libber. She's going to go to the union.... She's going to go to women's rights."

* Gerald Fahey, an investigator for the Minnesota Department of Human Rights, testified that he suggested to the president of the union that in order to protect wrappers' jobs, the union should attempt to negotiate a fixed ratio of meat cutters to meat wrappers. The union president responded that "we like the contract the way it is, ... we want to protect the rights of the [meat cutters] and we're not going to make any changes...."

* Plaintiff Paula Rust testified that she heard the union president say to a group of meat cutters, "isn't it great we're going to be rid of all the meat wrappers by the end of this year?"

* Plaintiff Lorraine Tyler testified that she attended a union meeting at which members were discussing provisions of the not-yet-signed 1983 collective bargaining agreement. Tyler stated that "when they got done they didn't say nothing about us wrappers, and I was the only girl there. I raised my hand and I said ... "What about the wrappers? What is gonna happen?" Tyler testified that, in response, the men at

---

3. The complaint originally named both the union and Country Club as defendants; the plaintiffs settled with Country Club sometime before the district court entered the order that is the subject of this appeal.

4. According to the plaintiffs, 49 percent of the Country Club meat wrappers, all women, were laid off, while only nine percent of the meat cutters lost their jobs. In addition, many of the

meat cutters who retained their jobs had less seniority than the laid-off meat wrappers.

5. It is not clear from the record exactly when these statements were made. Because we are reviewing the evidence in the light most favorable to the plaintiffs, we will assume for the purposes of this summary judgment motion that they were made prior to or contemporaneous with the negotiation of the 1983 contract.

the meeting shouted her down. Similarly, plaintiff Annabelle Carter testified that "it seems like every time any of the women stood up to say anything" at a union meeting, "there was so much noise and booing and embarrassed you so bad you had to sit back down."

* Carter also testified that a meat cutter told Carter's husband, in her presence, that "we don't want no damn women in my shop. We're going to get rid of her." A meat department supervisor told Carter that "there's always something wrong with them damn women."

* Meat wrapper Janice Schultz stated in an affidavit that the union president stated at a union meeting that "Country Club wanted to get rid of the girls."

As noted above, the district court held that the union's conduct, as a whole, passed the *ALPA* "wide range of reasonableness" test. In so holding, however, the district court blurred the distinction between the "arbitrary" and "discriminatory" prongs of the *ALPA* test. The "wide range of reasonableness" standard applies only to allegedly *arbitrary* union conduct. *See ALPA*, 111 S.Ct. at 1135–36; *Bennett v. Local Union No. 66*, 958 F.2d 1429 (7th Cir.1992); *Velez v. Puerto Rico Marine Mgmt., Inc.*, 957 F.2d 933 (1st Cir.1992); *Perry v. Million Air*, 943 F.2d 616, 619 (6th Cir.1991). The plaintiffs in this case do not charge that the union's conduct in negotiating the contract was arbitrary. Rather, they contend that the union intentionally and invidiously discriminated against its female members. It is irrelevant, therefore, whether the final contract fell within a "wide range of reasonableness." We look instead to whether the plaintiffs have presented enough evidence of discrimination by the union to create a genuine issue of material fact. Fed.

R.Civ.P. 56(c); *see also Martin v. Local 1513 and Dist. 118 of the IAMAW*, 859 F.2d 581, 584 (8th Cir.1988) (to establish a prima facie Title VII case against a union based on a breach of the duty of fair representation, plaintiff must show that union breached the duty, and that the breach was motivated by the complainant's race, color, religion, sex, or national origin); *Babrocky v. Jewel Food Co. & Retail Meatcutters*, 773 F.2d 857, 868 (7th Cir.1985) (same).

Our review of the record leads us to the same conclusion that the district court reached in its initial denial of the union's summary judgment motion. The plaintiffs have established that a dispute exists on a genuine issue of material fact: whether the union's conduct of its affairs was discriminatory, in violation of Title VII. Unlike the plaintiffs in *ALPA*, who complained only of discrimination against former striking pilots, the plaintiffs here have presented evidence of intentional discrimination against women, a "protected class" under Title VII. The final contract alone may very well fall within a "wide range of reasonableness." When viewed in the light most favorable to the plaintiffs, however, the contract, along with the union's alleged conduct during negotiations and the blatantly biased remarks recounted by the plaintiffs, is evidence of exactly the sort of "invidious discrimination" that Title VII was designed to prevent. *See Los Angeles Dept. of Water & Power v. Manhart*, 435 U.S. 702, 707 n. 13, 98 S.Ct. 1370, 13 n. 13, 55 L.Ed.2d 657 (1978) (Congress intended Title VII to "strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes.") (citation omitted); *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251, 109 S.Ct. 1775, 17, 104 L.Ed.2d 268 (1989) (discriminatory remarks can be evidence of Title VII violation).

The union emphatically denies most of the plaintiffs' allegations.[6] It contends

---

6. The union also argues that only plaintiff Annabelle Carter properly appealed from the district court's order, because the other plaintiffs' names were left off the notice of appeal. A review of the district court record, however, reveals that a properly amended notice of appeal as to all plaintiffs was timely filed on June 12, 1991.

that layoffs in the meat department at Country Club were inevitable, and that the union did everything possible to protect wrappers' jobs, including proposing "red-circling" and "dovetailing." A strike over job security for wrappers would not have been successful, according to the union, because wrappers constituted a small minority of the union membership.[7] Moreover, the union claims that a number of meat wrappers were opposed to any expansion of their duties, arguing that they already had enough work to do. The union also points out that although Country Club employed only male cutters and female wrappers, other stores covered by the same contract employed a small number of male wrappers and female cutters. According to the union, women were not prevented from training to become meat cutters if they so desired. In addition, there was a woman on the union's contract negotiating team.

In the context of a motion for summary judgment, however, the union's arguments simply demonstrate a factual dispute that requires resolution at trial. We therefore reverse the district court's order, and remand for further proceedings consistent with this opinion. In so doing, we of course express no opinion about whether the union actually discriminated against the meat wrappers.

---

7. Joanne Nelson, one of the union's negotiators, stated that "I doubt very much if the majority of the meat division would have gone out on strike and hit the bricks to protect the numbers of the wrappers." Orville Carter, another union nego- tiator, put the strike issue more plainly, saying something to the effect that "I've got these guys to protect, they would kill me, there's more men than women."