56 F.3d 961
 149 L.R.R.M. (BNA) 2520, 130 Lab.Cas. P 11,348
 Jack POTTER, individually and on behalf of all others
similarly situated; Warner Hurt, individually and
on behalf of all others similarly
situated, Plaintiffs-Appellants,
v.
ASSOCIATED ELECTRIC COOPERATIVE, INC.; United Mine Workers
of America, Local 7688, Defendants-Appellees.
 No. 94-3663.
 United States Court of Appeals,
Eighth Circuit.
 Submitted April 10, 1995.
Decided June 8, 1995.
 
 Ronald F. Bunn, Columbia, MO, argued (Loramel P. Shurtleff, on the brief), for appellants.
 Barry A. Woodbrey, St. Louis, MO, argued (Craig S. Johnson, Jefferson City, MO and Gerald Kretmar, St. Louis, MO, on the brief), for appellees.
 Before WOLLMAN, Circuit Judge, FRIEDMAN* Senior Circuit Judge, and LOKEN, Circuit Judge.
 FRIEDMAN, Senior Circuit Judge.
 
 
 1
 The question is whether the district court** correctly granted summary judgment dismissing the appellants' complaint in so far as it charged the appellee union with violating its duty of fair representation of the appellants and other similarly situated employees. The district court held that the appellants' failure to invoke the grievance procedures of the industry-wide collective bargaining agreement barred them from maintaining the suit. We affirm, but on a different ground.
 
 I.
 
 2
 A. The underlying facts, as stated in the district court's opinion or as shown by the record, are as follows:
 
 
 3
 In December 1988 the appellants Potter and Hurt were employed at NEMO Coal, Inc.'s NEMO Mine in Missouri. The employees there were members of Local 2366 of the United Mine Workers of America (UMW).
 
 
 4
 On December 30, 1988, the appellee Associated Electric Cooperative, Inc. (Associated) acquired NEMO Coal. Associated operated the Thomas Hill Mine, whose employees were represented by UMW Local 7688. At the time of the acquisition, Associated transferred most of the NEMO Mine employees to the Thomas Hill Mine. Early in January 1989, Associated discontinued operations at NEMO Mine and laid off most of the remaining employees there, including Potter and Hurt.
 
 
 5
 At that time, both NEMO Coal and Associated were signatories to the National Bituminous Coal Wage Agreement of 1988 (National Agreement). That Agreement contained no provision for severance benefits for laid-off employees. It provided a grievance procedure for resolving questions about the "meaning and application" of the National Agreement and "matters not specifically mentioned" in the Agreement. In January 1991 the National Agreement was reopened for negotiation of wage and pension benefits, but no change was made in the lack of severance benefits.
 
 
 6
 In March 1991, Associated and the UMW agreed upon a merger of Local 2366 into Local 7688. In accordance with the National Agreement, which provided that seniority was to be determined on an individual mine basis, former NEMO Mine employees were placed at the bottom of the Associated seniority list. The agreement also provided: "The continuous service of NEMO employees will not be broken by the merger and will continue to apply in the calculation of all other contractual benefits."
 
 
 7
 In order to comply with the 1990 amendments to the Clean Air Act, in June 1992, Associated decided to stop using the high sulphur Missouri coal the Thomas Hill Mine produced and to terminate operation of that mine. Between July and November 1992 Local 7688 and Associated bargained over the effects of the mine closing on Local 7688's members. The Union sought severance benefits for all members of the bargaining unit, which included the former employees of the NEMO Mine who had been laid off in January 1989. Associated, however, refused to provide benefits for employees who were not working at the Thomas Hill Mine, and the Union ultimately agreed to an Income Security Agreement, dated November 24, 1992, which limited benefits to active employees as of November 1, 1992.
 
 
 8
 Since Potter and Hurt and similarly situated other former employees of the NEMO Mine had been laid off almost 4 years earlier, they were not active employees on the November 1, 1992 cut off date and therefore did not receive severance benefits. Neither Potter nor Hurt invoked the grievance procedures of the National Agreement to protest the denial of severance benefits to them.
 
 
 9
 Pursuant to the Income Security Agreement, Associated paid approximately twenty-six million dollars to approximately 330 employees, who constituted about eighty-four percent of Local 7688's membership, including a number of former Local 2366 members and excluding a number of employees who had been members of Local 7688 prior to the March, 1991 merger of the two UMW locals.
 
 
 10
 B. Potter and Hurt filed the present class action suit (which has not been certified) for damages and declaratory relief against Associated and Local 7688 in the United States District Court for the Eastern District of Missouri. The complaint contained two counts. Count I asserted that Associated had breached its contractual obligation under the March 1991 agreement "to provide to plaintiffs the same rights and benefits, except for the endtailing of their seniority for recall purposes, which other members of the Union receive" under the Income Security Agreement. Count II charged that Local 7688 had breached its duty of fair representation of the plaintiffs because "by concluding with Company the above referenced Income Security Agreement, which arbitrarily and discriminatorily denies to plaintiffs the benefits and rights accorded to other Union members, defendant Union breached its duty to plaintiffs of fair representation."
 
 
 11
 The district court granted the defendants' motions for summary judgment and dismissed the complaint. The court held that the plaintiffs' failure to exhaust the grievance procedures under the National Agreement barred them from maintaining the two causes of action asserted in the complaint.
 
 II.
 
 12
 In their appeal to this court Potter and Hurt challenge only the district court's dismissal of Count II of the complaint alleging a violation of the Union's duty of fair representation. In response, Associated urges us to dismiss it as an appellee, since Count II asserted a claim against only the Union and not against it. In a letter to Associated's counsel, Potter and Hurt's counsel agreed that "by not contesting the district court's dismissal" of Count I, the appellants "have abandoned their cause of action against" Associated and "will not oppose a motion by" Associated to dismiss it as a party, which Associated stated it intended to file.
 
 
 13
 Associated is correct. The breach of fair representation claim in Count II was asserted only against Local 7688. The charge was that the Union improperly agreed on behalf of its members in the Income Security Agreement that only active employees, and not former employees of NEMO Mine who had been laid off in January 1989, would receive severance benefits. This alleged violation of the Union's duty of fair representation was asserted against and involved only the Union, not the employer, and the employer is not a party or otherwise involved in that dispute. We shall, therefore, dismiss Associated from this appeal. See Breininger v. Sheet Metal Workers Int'l Ass'n, 493 U.S. 67, 84 & n. 8, 110 S.Ct. 424, 435, n. 8, 107 L.Ed.2d 388 (1989) ("We have recognized that although a Sec. 301 suit against the employer and a fair representation claim are 'inextricably interdependent,' breach of the duty of fair representation is a cause of action separate from any against the employer." (Citations omitted)).
 
 III.
 
 14
 "As a general rule in cases to which federal law applies, federal labor policy requires that individual employees wishing to assert contract grievances must attempt use of the contract grievance procedure agreed upon by employer and union as the mode of redress." Republic Steel Corp. v. Maddox, 379 U.S. 650, 652, 85 S.Ct. 614, 616, 13 L.Ed.2d 580 (emphasis in original, footnote omitted) (1965). The principle applies to severance pay, and an employee's failure to invoke the contractual grievance procedure bars him from directly suing the employer for such pay. Id. at 653-657, 85 S.Ct. at 616-619. See also Moore v. General Motors Corp., 739 F.2d 311, 317 (8th Cir.1984), cert. denied, 471 U.S. 1099, 105 S.Ct. 2320, 85 L.Ed.2d 839 (1985) ("The Collective Bargaining Agreement from which Moore's transfer rights arise, requires that Moore resort to the grievance procedures set forth in the Agreement").
 
 
 15
 Potter and Hurt's claim against the Union for violating its duty of fair representation, however, is not an assertion of a grievance under the Collective Bargaining Agreement, but is based upon the Union's violation of its "statutory duty fairly to represent all of those employees" in the bargaining unit. Vaca v. Sipes, 386 U.S. 171, 177, 87 S.Ct. 903, 909, 17 L.Ed.2d 842 (1967). Their claim is that the Union violated that duty when it agreed to accept severance benefits for the majority of the employees in the bargaining unit but did not include Potter and Hurt among them.
 
 
 16
 The Union's statutory duty exists apart from, and is not dependent on, the National Agreement, which does not provide for severance benefits. Although the National Agreement contains a broad grievance procedure, which covers questions involving the "meaning and application" of the Agreement and "matters not specifically mentioned" in it, the National Agreement deals with the relationship between employers and employees. The present case, however, involves the relationship between the employees and their union, and this is a matter that the National Agreement does not cover.
 
 
 17
 In the circumstance, Potter and Hurt were not required to invoke the grievance procedures of the National Agreement before suing their union for violation of its duty of fair representation. See Carr v. Pacific Maritime Ass'n, 904 F.2d 1313, 1319 (9th Cir.1990), cert. denied, 498 U.S. 1084, 111 S.Ct. 957, 112 L.Ed.2d 1045 (1991) (stating that plaintiff need not exhaust grievance procedures if alleged breach of duty of fair representation concerns the negotiation of a collective bargaining agreement). The policy considerations that underlie the requirement of exhausting the grievance procedures in a collective bargaining agreement before suit may be maintained for violation of that agreement, discussed in Maddox, 379 U.S. at 653, 85 S.Ct. at 616-17, are inapplicable in the present situation. We therefore cannot sustain the district court's ruling that Potter's and Hurt's failure to exhaust the grievance procedures under the National Agreement barred their claims against the Union for breach of its duty of fair representation.
 
 IV.
 
 18
 We affirm the district court's grant of summary judgment dismissing that claim, however, on the alternative ground that viewing the record most favorably to Potter and Hurt, the undisputed facts show that the Union did not breach its duty of fair representation in negotiating and accepting the Income Security Agreement under which they did not receive severance benefits.
 
 
 19
 Under the Union's duty of fair representation "the exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." Vaca, 386 U.S. at 177, 87 S.Ct. at 910. See, also, Schmidt v. IBEW, 980 F.2d 1167, 1169 (8th Cir.1992). The undisputed facts show that Local 7688 did not violate any of these requirements.
 
 
 20
 An affidavit by Lyle J. McGowan, who had worked for NEMO Coal from 1978 to 1989 and then for Associated and had served as a UMW official on both the local and national levels, stated that between July and November 1998 the Union and Associated "undertook extensive negotiations with respect to the financial effects on UMWA miners of terminating mining operations"; that at "an initial negotiating session" on July 27, 1992, he "proposed that the severance package include all employees covered by the 1988 [National Agreement], which would have included Plaintiffs, as well as, those in the proposed class"; and that Associated "objected to any severance package covering inactive employees and was adamant that the agreement be limited to those employees laid off as a result of the reduction in force." He further stated:
 
 
 21
 The Income Security Agreement was the product of hard bargaining between the UMWA and Associated. The UMWA pushed for benefits covering all of its members. It was only when the UMWA realized that Associated had given all it was going to, that the UMWA accepted November, 1992, as the cut-off date. [emphasis in original]
 
 
 22
 James H. Walker, Associated's labor relations manager, stated virtually identical facts. In his affidavit he stated that between July and November 1992 Associated and the Union had "extensive negotiations with respect to the financial effects on UMWA miners of terminating mining operations"; that the Union initially "proposed that the severance package include all employees covered by the 1988 [National Agreement], which would have included the individuals proposed to be in the Plaintiff class"; that Associated "objected to any severance package covering inactive employees" and proposed that "the agreement to bargain over the severance proposal be limited to covering all employees laid off as a result of the reduction"; and that "in verbal negotiations thereafter, it was agreed that only those employees working on November 1, 1992 would be covered."
 
 
 23
 Potter and Hurt argue that the Union should have continued during the negotiations to press for severance benefits for them and their class. They did not present, by affidavit or otherwise, any facts to counter the foregoing evidence from both the Union and management side that the Union sought those benefits but was unable to obtain them in vigorous and protracted negotiations because Associated was adamant that it would provide benefits only to employees actually working at the Thomas Hill Mine at the time of its closing.
 
 
 24
 Since the governing collective bargaining agreement in this case did not provide for severance benefits, Associated was not required to grant them to any employees. The Union was in a weak position in its severance benefits negotiations with Associated. Since these negotiations took place after Associated had decided to close the Thomas Hill Mine, the Union could not have effectively relied upon a strike threat to support its demand for benefits for the Potter and Hurt group. Indeed, once Associated had made it clear that it would provide severance benefits only for employees actually working at the time of mine closing, the Union might have jeopardized benefits for the group of miners so employed had it insisted that severance benefits must be provided to all employees in the bargaining unit. The Collective Bargaining Coordinator of the UMW stated in an affidavit that in "effects" bargaining--"when an Employer decides to cease all coal production and close all of its mines"--"there have been situations where an Employer has left his employees, our members, with nothing."
 
 
 25
 Air Line Pilots Ass'n, Int'l v. O'Neill, 499 U.S. 65, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991), involved a union's alleged violation of its duty of fair representation in negotiating an agreement governing the terms upon which striking employees would return to work. In holding that the union had not violated that duty, the Court stated:
 
 
 26
 Any substantive examination of a union's performance, therefore, must be highly deferential, recognizing the wide latitude that negotiators need for the effective performance of their bargaining responsibilities. For that reason, the final product of the bargaining process may constitute evidence of a breach of duty only if it can be fairly characterized as so far outside a "wide range of reasonableness," that it is wholly "irrational" or "arbitrary."
 
 
 27
 Id. at 78, 111 S.Ct. at 1135-36 (citations omitted).
 
 
 28
 The present case is unlike Carter v. United Food and Commercial Workers, 963 F.2d 1078 (8th Cir.1992), where we held that the district court erroneously granted summary judgment dismissing a suit charging the union with violating its duty of fair representation. The charge was that in the collective bargaining negotiations the union had favored its male over its female members. We ruled that because the charge was that the union had discriminated against its female members, the proper standard for evaluating the union's conduct was not "[t]he 'wide range of reasonableness' " standard under ALPA, which "applies only to allegedly arbitrary union conduct," but "whether the plaintiffs have presented enough evidence of discrimination by the union to create a genuine issue of material fact." Id. at 1082 (emphasis in original). We held that the plaintiffs had "allege[d] pervasive discrimination against women in the retail meat industry by their union, their male coworkers, and their employer," id. at 1081 (footnote omitted), and "have established that a dispute exists on a genuine issue of material fact: whether the union's conduct of its affairs was discriminatory, in violation of Title VII," Id. at 1082.
 
 
 29
 In the present case, however, there is no claim of sex discrimination. Potter and Hurt have not presented any facts to refute the record evidence that the union did the best it could to obtain severance benefits for the laid-off former NEMO Mine workers but, because of Associated's unequivocal opposition, was unable to do so. The union did not discriminate arbitrarily against the Potter-Hurt group. It attempted in good faith to obtain severance benefits for them, but was unsuccessful.
 
 
 30
 In Humphrey v. Moore, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964), the Court refused
 
 
 31
 to find a breach of the collective bargaining agent's duty of fair representation in taking a good faith position contrary to that of some individuals whom it represents nor in supporting the position of one group of employees against that of another. In Ford Motor Co. v. Huffman, 345 U.S. 330 [73 S.Ct. 681, 97 L.Ed. 1048 (1953) ] the Court found no breach of duty by the union in agreeing to an amendment of an existing collective bargaining contract, granting enhanced seniority to a particular group of employees and resulting in layoffs which otherwise would not have occurred. "Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion." Id. at 338 [73 S.Ct. at 686]. "Conflicts between employees represented by the same union is a recurring fact. To remove or gag the union in these cases would surely weaken the collective bargaining and grievance processes."
 
 
 32
 Id. at 349-50, 84 S.Ct. at 371-72.
 
 
 33
 Here, as was the case with the agreement in O'Neill, the Income Security Agreement that the Union negotiated with Associated, which provided severance benefits for approximately 84 percent of Local 7866's members, was not "so far outside a wide range of reasonableness" that "it was wholly 'irrational' or 'arbitrary,' " even though it did not provide severance benefits for the former employees of NEMO Coal who were laid off after the closing of the NEMO Mine.
 
 
 34
 The appeal is dismissed against Associated Electric Cooperative, Inc. The judgment of the district court is affirmed.
 
 
 
 *
 DANIEL M. FRIEDMAN, of the United States Court of Appeals for the Federal Circuit, sitting by designation
 
 
 **
 Honorable Jean C. Hamilton, United States District Judge for the Eastern District of Missouri