# United States Court of Appeals

### For the Eighth Circuit

_____

No. 21-3881

_____

Sameh Mahmoud Mohamed Said, MD

*Plaintiff - Appellant*

v.

Mayo Clinic; Joseph Albert Dearani, MD

*Defendants - Appellees*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: June 16, 2022
Filed: August 17, 2022

_____

Before GRUENDER, BENTON, and GRASZ, Circuit Judges.

_____

GRASZ, Circuit Judge.

Sameh Mahmoud Mohamed Said, MD, resigned from his employment as a surgeon with Mayo Clinic ("Mayo") after an internal committee recommended his termination following an investigation into allegations of his misconduct. Said sued Mayo and his supervisor, Joseph Albert Dearani, MD, alleging discrimination and

reprisal.  The district court[1] granted summary judgment in favor of Mayo and Dearani.  We affirm.

## I.  Background

Said is an African-American, Egyptian national, and practicing Muslim.  In 2015, Mayo hired Said as a senior associate consultant in Mayo's cardiovascular surgery department ("the Department").  Said claims Dearani objected to his hiring, allegedly saying Said was "not Mayo material."  Mayo, however, asserts it was ultimately Dearani's decision as the Department chair to hire Said.  The senior associate consultant position was viewed in the Department as a temporary position, and Said was scheduled to be considered for promotion to a permanent consultant role after three years.[2]

In December 2016, Mayo conducted a 360-degree review of Said, meaning he was evaluated by multiple coworkers at different levels—subordinates, peers, and supervisors.  Said received positive evaluations for his technical performance but received multiple "red flags" for his treatment of Mayo staff, his professionalism, and his communication skills.  Said claims he did not receive written feedback about his 360-degree review until fifteen months after the review was conducted.  Said asserts he did not receive another 360-degree review at Mayo, which Said alleges violated Mayo's review policies.

In October 2017, two female anesthesiologists at Mayo, "Dr. A" and "Dr. F," complained that Said made unwelcomed advances.  Dr. A reported that Said persistently pursued a romantic relationship with her even though he knew she was

---

[1]The Honorable Eric C. Tostrud, United States District Judge for the District of Minnesota.

[2]Said argues he was eligible for promotion consideration after two years.  But record evidence, including his own testimony, indisputably demonstrates his first promotion consideration was scheduled three years after he was hired.

in a relationship. Dr. F reported several lunch and dinner invitations she found inappropriate. Both Dr. A and Dr. F raised fears of retaliation. Mayo's Human Resources ("HR") representative Steffany Guidinger met with Said to discuss the allegations. Said admitted his advances were mistakes, and Guidinger informed Said he needed to stop pursuing these women. Said claims Guidinger and Mayo's then Administrative Manager, Renee Jones, assured him the matter was "closed." Based on Dr. A's and Dr. F's complaints and the red flags from Said's 360-degree review, Mayo postponed Said's promotion consideration for six months to December 2018.[3]

In the spring and summer of 2018, the Department conducted a "Cultural Assessment" of its employees. During the review, the Department received complaints about multiple surgeons, including Said. The assessment revealed complaints accusing Said of yelling and cursing on the job, openly complaining about anesthesia staff, and scheduling too many elective surgeries during off-hours, and also that Said's continued pursuit of unwelcome romantic relationships with colleagues had a negative impact on the Department's culture. As a result of the assessment, Said's promotion consideration was again postponed by six months to June 2019.

In October 2018, physician assistant "R.R." reported that Said had persistently pursued an unwelcomed romantic relationship with her. Mayo opened an investigation into R.R.'s complaint and placed Said on administrative leave. The investigation revealed evidence of Said's inappropriate advances. R.R. produced text messages Said sent her complimenting her appearance, making a comment about her going to a swimming pool that she understood as a sexual allusion, and expressing his love and desire for a romantic relationship with her despite knowing she was in a relationship. Said bought R.R. gifts, including perfume, a keychain with an engraved picture of her dog, and a ruby ring. R.R. also reported that Said kept a notebook in his office and showed her a page declaring his feelings for her.

---

[3]Said testified Dearani originally told him his promotion consideration would be postponed only three months.

The notebook was later discovered by Dearani, who confirmed the notebook's contents were as R.R. described.

Said claims his feelings were initially reciprocated and that he stopped pursuing R.R. after she said she was not interested. But R.R. reported that Said sent her inappropriate communications after she indicated she was not interested in the relationship. R.R. stated that after she had told Said they could only be friends, he asked her to meet in R.R.'s office where he closed the door and again expressed his romantic feelings for her. R.R. claimed Said sat with his legs open toward R.R. during the conversation and demonstrated inappropriate signs of arousal. Later, R.R. returned from an out-of-town trip when Said, upon seeing her, told her he missed her very much. R.R. stated she was angry at the comment and returned all of the gifts Said had given her, saying she was not interested in his advances and that she would leave her job if they continued.

R.R. reported she continued to feel emotionally manipulated by Said. R.R. disclosed a video Said had sent her after he had asked her to attend a surgery in which physician assistants were usually not included. The video was set to music and showed Said and R.R.'s hands overlapping on a patient's heart during surgery. R.R. explained during the investigation that she was afraid of losing her job by reporting Said because of the power differential. R.R. also mentioned she was concerned about reporting Said because he had complained to R.R. that Dr. A "stabbed him in the back" when she reported him.

The investigation also revealed other misconduct. This included evidence that Said had downloaded sexually explicit material to a Mayo computer, sent inappropriate emails to his medical secretary (including one where he was planning to buy "Secret Santa" gifts from a lingerie store), attempted to destroy or alter evidence from his notebook during the investigation, misused his Mayo travel card for personal expenses, and expressed hatred toward Dearani with inappropriate language in communications to colleagues.

-4-

During the investigation, Said sent a letter to Mayo through his counsel, claiming he was being discriminated against because of his race and/or national origin. Three days after Said's counsel sent the letter, Mayo received an anonymous internal complaint speculating Mayo's treatment of Said was related to his race. When Said was interviewed by HR for the investigation, he raised no concerns of discrimination but stated that Dearani orchestrated the allegations because of professional jealousy.

Mayo's investigation resulted in a recommendation by Dearani, Dr. Charanjit Rihal (Chair of the Personnel Committee), and Kevin Hennessey (Operations Administrator for the Department) (collectively, the "Recommendation Committee") for Said's termination. Said received a letter from the Recommendation Committee notifying Said of the termination recommendation and outlining his misconduct leading to the recommendation. In the list of Said's misconduct, along with many of the allegations against Said already discussed, the Recommendation Committee accused Said of filing a discrimination complaint that was "demonstrably false." The letter also explained that the recommendation would be sent to Mayo's Termination Review Committee who would make a final determination on Said's employment.

Said resigned the day before the Termination Review Committee was scheduled to convene to discuss Said's employment. Mayo reported the circumstances of Said's resignation to the Minnesota Board of Medical Practice (the "State Board").[4]

Said filed a discrimination charge with the EEOC that was cross-filed with the Minnesota Department of Human Rights. Said received a Notice of Right to Sue from the EEOC. The Minnesota Department of Human Rights dismissed Said's

---

[4]In May 2020, the State Board reprimanded and fined Said after Said entered a Stipulation and Order in which he agreed that he had resigned after the Recommendation Committee recommended his termination in part for "sexually harassing female staff and portraying unprofessional and disrespectful behaviors."

state charge but clarified he could bring a private civil action against Mayo.  Said then sued Mayo and Dearani alleging, among other things, that Mayo discriminated against Said based on his race, religion, and national origin under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, and the Minnesota Human Rights Act (the "MHRA"), Minn. Stat. § 363A.08, subd. 2.  The complaint also alleged one count of reprisal under the MHRA, Minn. Stat. § 363A.15, against Mayo.

Mayo and Dearani moved for summary judgment on all claims.  The district court granted the motion, holding Mayo and Dearani were entitled to judgment as a matter of law.  Said appeals.[5]

## II.  Analysis

We review the district court's grant of summary judgment de novo, "viewing the facts and inferences . . . in the light most favorable to the nonmoving party." *Walsh v. Alpha & Omega USA, Inc.*, No. 21-2961, __ F.4th __, 2022 WL 2719984, at \*2 (8th Cir. July 14, 2022) (alteration in original) (quoting *Vandewarker v. Cont'l Res., Inc.*, 917 F.3d 626, 629 (8th Cir. 2019)).  We will affirm summary judgment only when the record shows "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Green Plains Otter Tail, LLC v. Pro-Env't, Inc.*, 953 F.3d 541, 545 (8th Cir. 2020) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011)).

---

[5]Said only appeals claims he raised against Mayo.  Thus, we dismiss Dearani from this appeal. *See Potter v. Associated Elec. Co-op., Inc.*, 56 F.3d 961, 963 (8th Cir. 1995).

## A. Discrimination under Title VII and the MHRA

Said argues Mayo's recommendation to terminate his employment was based on his race, religion, and national origin. Because Said does not offer direct evidence of discrimination, Said must "create[] a sufficient inference of discrimination under the *McDonnell Douglas* framework" to survive summary judgment.[6] *Findlator v. Allina Health Clinics*, 960 F.3d 512, 514 (8th Cir. 2020) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)). Under the *McDonnell Douglas* framework, "a plaintiff must first state a prima facie case of discrimination, which shifts the burden to the defendant to proffer a legitimate non-discriminatory reason for the challenged action." *Id.* at 515. "If the defendant presents a non-discriminatory reason, the burden shifts back to the plaintiff to demonstrate that the alleged reason was pretext for discrimination." *Id.*

### 1. Prima Facie Case

Said attempts to establish his prima facie case using a disparate treatment theory of discrimination. Under this theory, Said must offer "specific, tangible evidence" of at least one other employee who was "similarly situated in all relevant respects," including committing offenses "of the same or comparable seriousness" to Said's, who received disparate treatment compared to Said. *Rinchuso v. Brookshire Grocery Co.*, 944 F.3d 725, 730 (8th Cir. 2019) (quoting *Philip v. Ford Motor Co.*, 413 F.3d 766, 768 (8th Cir. 2005); *Fiero v. CSG Sys., Inc.*, 759 F.3d 874, 879 (8th Cir. 2014)).

---

[6]Claims of discrimination under the MHRA are analyzed under the same standard as Title VII discrimination, using the same federal case law. *See Hansen v. Robert Half Int'l, Inc.*, 813 N.W.2d 906, 918 (Minn. 2012) (applying *McDonnell Douglas* burden-shifting framework to MHRA discrimination claim); *Fletcher v. St. Paul Pioneer Press*, 589 N.W.2d 96, 101 (Minn. 1999) ("In construing the MHRA, we apply law developed in federal cases arising under Title VII of the 1964 Civil Rights Act.").

Said claims Dr. Simon Maltais is a similarly situated former employee of Mayo who received preferential treatment. Maltais is white, Canadian, and an atheist. Mayo received numerous complaints about Maltais during his time at Mayo. These primarily consisted of complaints of Maltais's disrespectful, unethical, bullying, and inappropriate behavior toward his coworkers. Mayo received several complaints of an incident where Maltais intentionally and angrily bumped into a nurse practitioner. In another complaint, Dr. Lyle Joyce and his son, Dr. David Joyce, both of whom were consultants for the Department, reported Maltais had an "extremely serious conflict of interest" related to his relationship with a medical device manufacturer, and the complaint implied that Maltais was violating Mayo protocols due to this relationship. The Joyces' complaint also accused Dearani of showing favoritism toward Maltais and of forcing many physicians out of the Department—many of whom Said claims are minorities.

Another complainant reported overhearing a nurse say she saw a pornographic image on Maltais's phone when she took a call for him while he was conducting a surgery.[7] Also, like Said, Maltais received poor marks during the Department-wide "Cultural Assessment" for his communication style, insincerity, and damaging trust within the Department. Maltais's 360-degree review revealed concerns about his "interpersonal" and "communication" skills, including that he could be "abrasive," "retaliatory," "disrespectful," and prone to "outbursts of anger."

We agree with the district court that Maltais was not similarly situated to Said "in all relevant respects." *Rinchuso*, 944 F.3d at 730 (quoting *Fiero*, 759 F.3d at 879). Notably absent from the list of Maltais's alleged misconduct are any complaints of unwelcomed romantic advances or sexual harassment such as those made against Said. While misconduct of comparators "need only be of 'comparable seriousness' and not the 'exact same offense,'" *McKey v. U.S. Bank Nat'l Ass'n*, 978

---

[7]Dearani, Rihal, Guidinger, and the two Mayo employees who investigated R.R.'s complaint against Said all testified to either being unaware of this complaint or only aware through this lawsuit.

F.3d 594, 600 (8th Cir. 2020) (quoting *Ridout v. JBS USA, LLC*, 716 F.3d 1079, 1085 (8th Cir. 2013)), our ability to compare the seriousness of offenses does not vest us with the "the authority to sit as [a] super-personnel department[] reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination." *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir. 1995).

Here, Mayo determined Said sexually harassed his coworkers. And Said himself stipulated with the State Board that the Recommendation Committee's termination recommendation was based, in part, on allegations that he was "sexually harassing female staff[.]" On the other hand, Mayo did not consider the complaints against Maltais to be complaints of sexual harassment. Mayo has judged sexual harassment to be a unique[8] and severe offense,[9] and it is not our place, nor a jury's, to review the fairness of this judgment because it does not involve intentional discrimination. *See id.* And while Said argues Maltais created a hostile work environment for women, which Said argues is a more intolerable version of sexual harassment than his romantic advances, it is not for Said to define or grade types of sexual harassment for Mayo. We conclude Mayo was justified in treating Said's unwelcomed romantic advances and sexual harassment as not of the same or comparable seriousness to Maltais's disrespectful and bullying misconduct. *See Rinchuso*, 944 F.3d at 730.

---

[8]Mayo's harassment policy defines "harassment" and "sexual harassment" differently.

[9]Indeed, Mayo notes two other doctors at Mayo who received similar complaints of sexual harassment and were similarly investigated. "Dr. G" sought out romantic relationships with multiple junior female colleagues, was investigated, and received a recommendation of immediate termination that was reported to the State Board. "Dr. S" was accused of making a comment with sexual overtones. An investigation was opened, and Dr. S was placed on administrative leave. Though he retired before the investigation concluded, Mayo reported the circumstances of his investigation and retirement to the State Board.

We also note that Mayo actually terminated Maltais's employment, diminishing his fitness as a comparator to support an inference of discrimination. *See McKey*, 978 F.3d at 600 (rejecting a proposed comparator because, among other reasons, the proposed comparator "was also fired"). Said argues Maltais received preferable treatment because he was given a termination "runway" of six months and because Mayo did not report Maltais's termination to the State Board like it did Said's. Mayo's treatment of Maltais, however, was arguably more severe. Mayo gave Said two promotion deferrals before the Department ultimately recommended his termination. Maltais, on the other hand, never received a promotion deferral and was given his six-month notice of termination around the same time Said received his first promotion deferral. In other words, Mayo twice gave Said an opportunity to prove himself worthy of a permanent employment; it did not provide Maltais that same opportunity. Further, while Mayo terminated Maltais's employment, Said resigned before Mayo could terminate his employment. Thus, it is misleading for Said to complain that Mayo did not give him a termination runway when Mayo never actually terminated his employment nor set a termination date.

Regarding Mayo's reporting of Said's resignation to the State Board, Mayo believed Minnesota law required it to report Said's resignation because it occurred while his disciplinary case was still open. *See* Minn. Stat. § 147.111, subd. 2 ("Any hospital . . . shall . . . report the resignation of any physicians prior to the conclusion of any disciplinary proceeding[.]"). In contrast, Maltais's investigation had closed when his termination became effective. Thus, even if Said was similarly situated to Maltais, we conclude Said does not present sufficient evidence for a reasonable jury to conclude he received disparate treatment to Maltais. For all of these reasons, Said fails to state a prima facie case of discrimination.

## 2. Pretext

Even if Said could establish a prima facie case, he would still have to prove Mayo's proffered nondiscriminatory reasons for terminating him were pretext for discrimination. *See Torgerson*, 643 F.3d at 1047. An employer is justified in

-10-

terminating an employee for sexual harassment and inappropriate behavior. *See McCullough v. Univ. of Ark. for Med. Sci.*, 559 F.3d 855, 864–65 (8th Cir. 2009). So, to survive summary judgment, Said must show Mayo's nondiscriminatory reasons were pretext either by showing they were "unworthy of credence . . . because [they] ha[d] no basis in fact" or "by persuading the court that a [discriminatory] reason more likely motivated [Mayo]." *Torgerson*, 643 F.3d at 1047 (quoting *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1120 (8th Cir. 2006)).

As proof of pretext, Said points primarily to his technical work performance, Dearani's alleged statement that Said was "not Mayo material," Mayo's alleged failure to provide timely evaluations, and Said's belief that his feelings for his coworkers were reciprocated. We are not persuaded. First, an employee's technical competency does not shield him from discipline for misconduct. *See Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011, 1020 (8th Cir. 2005) ("[E]vidence of a strong employment history will not alone create a genuine issue of fact regarding pretext and discrimination.").

Second, Said offers nothing but speculation that his termination recommendation was more likely motivated by his race, religion, or national original than by his misconduct. *See Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 934 (8th Cir. 2006) (noting that while we review summary judgment "mak[ing] all reasonable inferences in favor of the nonmoving party," we must do so "without resort to speculation"). Said argues Dearani's alleged statement that Said was "not Mayo material" is an allusion to Said's protected statuses, but this statement was allegedly made *before* Said was hired and is too speculative and remote to create a genuine issue of material fact in the face of the strong evidence showing Mayo's termination recommendation was based upon Said's unwanted romantic advances and other misconduct.

Third, Mayo's alleged failure to periodically evaluate Said fails to show pretext. For one, while Said only received one 360-degree evaluation, he received other evaluations during his time. Said was hired in July 2015 and resigned in

-11-

December 2018. The record established that during that time, he received a review in February 2016, was evaluated under the 360-degree-review process in December 2016, received another review in May 2017, and in December 2017, he was coached through the results of the 360-degree review. Also, Said fails to present any evidence showing Mayo's failure to conduct more 360-degree reviews contributed to his ultimate termination recommendation or was itself mistreatment of Said. While additional positive performance reviews could have helped Said, additional negative performance reviews could have expedited Mayo's disciplinary actions. And Said provides little evidence that additional performance reviews would have alleviated the issues raised in the other reviews and in complaints against him. Indeed, Jones testified that Dearani did not initiate additional 360-degree reviews to protect Said from poor reviews.

Finally, while Said argues that some of his romantic feelings were reciprocated, the "critical inquiry . . . is not whether the employee actually engaged in the conduct for which he was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct[.]" *McCullough*, 559 F.3d at 861–62. The record overwhelmingly demonstrates that Mayo believed Said was guilty of making unwelcomed advances toward female coworkers and of other misconduct. Said fails to "create a real issue as to the genuineness of" Mayo's perceptions. *Edmund v. MidAmerican Energy Co.*, 299 F.3d 679, 685 (8th Cir. 2002).

For these reasons, we affirm the district court's grant of summary judgment in favor of Mayo with respect to Said's employment discrimination claims under Title VII and the MHRA.

## B. Reprisal

Said claims Mayo violated the MHRA prohibition against reprisal by retaliating against him because he alleged discrimination by Mayo. A prima facie MHRA reprisal case is established by showing by a preponderance of the evidence:

(1) an employee's statutorily protected activity; (2) an employer's adverse employment action; and (3) "a causal connection between the two." *Fletcher v. St. Paul Pioneer Press*, 589 N.W.2d 96, 101–02 (Minn. 1999) (quoting *Hubbard v. United Press Int'l*, 330 N.W.2d 428, 444 (Minn. 1983)). Once a prima facie case is established, the employer must articulate a legitimate nondiscriminatory reason for the adverse action, and then the employee bears the burden of proving that reason is pretext. *Id.* at 102.

The parties do not dispute that Said's complaint of discrimination (through his attorney) was a statutorily protected activity or that Mayo took an adverse employment action against Said. But Mayo argues Said failed to present sufficient evidence of a causal connection between his complaint and the adverse action.

Said primarily relies on a statement in the termination recommendation letter that referenced his allegations of discrimination:

> The recommendation that your appointment be terminated is based on the following:
>
> . . . .
>
> 5. Investigation revealed that the statement you and your attorney made that actions were being taken against you because of race/national origin, was demonstrably false. During your interview you specifically stated your belief that the current allegations being made against you were being "orchestrated" because Dr. Dearani was professionally jealous of you.

Even if this statement establishes a causal connection between Said's discrimination complaint and the Recommendation Committee's termination recommendation, Mayo articulates legitimate reasons for its adverse action which Said cannot sufficiently show were pretext. In the termination recommendation letter, the Department did not fault Said for simply making a discrimination complaint. It faulted Said for making a discrimination complaint that was "demonstrably false." We have held an employee's filing *untruthful* complaints is a nonretaliatory reason

-13-

justifying termination.[10] *See McCullough*, 559 F.3d at 858, 865; *see also Fletcher*, 589 N.W.2d at 101 (applying federal caselaw arising under Title VII to interpret the MHRA).

Said argues Mayo's proffered rationale that Said made an untruthful complaint was pretext because Mayo never opened an investigation into his allegations of discrimination. But the Recommendation Committee explained its reasons for believing the complaint was false in the termination recommendation letter—Said himself asserted that the reason for the allegations against him was Dearani's jealousy of Said. And Rihal testified that the discrimination allegation was sufficiently investigated by HR as a part of the investigation into Said's misconduct, which included a lengthy interview with Said. Further, Said's discrimination complaint came *after* the investigation into his conduct with R.R. was opened, and "[e]vidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity" between the protected activity and the adverse employment action. *A Xiong v. Minneapolis Pub. Schs.*, No. A18-2027, 2019 WL 4409715, at *3 (Minn. Ct. App. Sept. 16, 2019) (unpublished) (quoting *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 834 (8th Cir. 2002)); *see also Hervey v. Cnty. of Koochiching*, 527 F.3d 711, 723 (8th Cir. 2008) ("Insubordinate employees may not insulate themselves from discipline by announcing an intention to claim discrimination just before the employer takes action.").

Finally, regarding Mayo's reporting of Said's resignation to the State Board, as already discussed, the record demonstrates Mayo believed it was required to report Said's termination to the State Board because Said resigned during an open investigation into his misconduct. *See* Minn. Stat. § 147.111, subd. 2; *see also* Minn. Stat. § 147.121, subd. 1 ("Any person, health care facility, business, or organization is immune from civil liability . . . for submitting a report to the board pursuant to

---

[10]Thus, Mayo's accusing Said of filing an untruthful complaint is also not direct evidence of reprisal requiring trial as Said suggests.

-14-

section 147.111 . . . .").  Said fails to present sufficient evidence showing this was pretext for retaliatory intent.

### III.  Conclusion

For the reasons stated herein, we affirm the district court's grant of summary judgment in favor of Mayo.

_____